745 A.2d 1045

ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

Jane K. TOLAR.

Misc. Docket AG, No. 26, Sept. Term, 1999.

Court of Appeals of Maryland.

Feb. 10, 2000.

Melvin Hirshman, Bar Counsel, and James P. Botluk, Asst. Bar Counsel, of Attorney Grievance Com'n of Maryland, for Petitioner.

Thomas G. Bodie, Towson, for Respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL and HARRELL, JJ.

PER CURIAM.

The Attorney Grievance Commission of Maryland (the "Commission"), the petitioner, by Bar Counsel, acting pursuant to Maryland Rule 16–709, filed a Petition for Disciplinary Action against Jane K. Tolar, the respondent, alleging that she did engage in misconduct. In the Petition, the respondent was charged with violating Rules 1.3, Diligence,[1] 1.4, Communication,[2] and 8.1, Bar Admission and Disciplinary Matters,[3] of the Maryland Lawyers' Rules of Professional Conduct. The Petition was referred, pursuant to Maryland Rule 16–711(a),[4]

---

**1.** That Rule provides:

"A lawyer shall act with reasonable diligence and promptness in representing a client."

**2.** That Rule provides:

"(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.

"(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."

**3.** That Rule provides:

"An applicant for admission or reinstatement to the bar, or a lawyer in connection with a bar admission application or in connection with a disciplinary matter, shall not:

"(a) knowingly make a false statement of material fact; or

"(b) fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter, or knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority, except that this Rule does not require disclosure of information otherwise protected by Rule 1.6."

**4.** Rule 16–711(a) reads:

to the Hon. Donald C. Davis, of the Circuit Court for Wicomico County, for hearing and to make finding of fact and conclusions of law.

Following a hearing, the hearing court, as required, filed Findings of Fact, as follows:

## *"FINDINGS OF FACT*

"Based upon the testimony and exhibits [1] produced at the hearing, the Court finds the following to be established by clear and convincing evidence:

"1.   Jane K. Tolar was admitted to the Maryland Bar in 1975. She has practiced law in Talbot County, Maryland, since 1977 and has been in solo litigation since 1988.

"2.   Linda Hallowell retained Respondent to represent her in a divorce action initiated by Mr. Hallowell in the Circuit Court for Dorchester County, Maryland. The terms under which Respondent was retained were incorporated in a retainer agreement dated August 2, 193 . . . (the "Retainer Agreement").

"3.   Under the terms of the Retainer Agreement, Respondent was to be compensated for services rendered to Mrs. Hallowell at the rate of $125.00 per hour and Respondent's fee was to be paid "from [Mrs. Hallowell's] marital settlement or the proceeds of a monetary award." The Retainer Agreement further provided as follows:

'Client agrees that statements for services rendered shall be paid within thirty (30) days after Client receives the marital settlement or monetary award, except as agreed

---

"Rule 16–711. Disposition of Charges.
a.   Findings. A written statement of the findings of fact and conclusions of law shall be filed in the record of the proceedings and copies sent to all parties."

**1.**   A transcript of the testimony of the Complainant and Respondent before the Inquiry Panel was admitted into evidence as a joint exhibit. However, both also testified at the hearing before the Court.

to between the parties, and that any failure to pay statements within such period may be construed by Attorney as a discharge of it from its employment hereunder, in which event Attorney may move to have its appearance withdrawn from any court action then pending. Such withdrawal shall not relieve Client from the obligation to pay any sums due and owing for services previously rendered pursuant to this Agreement.'

"4. The marital property of the Hallowells included interests of Mr. Hallowell in retirement plans at Continental Can Company ("Continental")[2] and Fluor Corporation ('Fluor').

"5. On November 22, 1994, the Hallowell divorce case was called for trial in the Circuit Court for Dorchester County, Maryland. The parties announced on the record the terms of a settlement agreement with respect to the case and testimony was taken in support of the claim of Mr. Hallowell for divorce. Counsel were to submit an order for signature by the Court.

"6. Despite the settlement announced on the record, the parties continued to negotiate terms of their settlement for the next five months. A primary problem was that, because, Mr. Hallowell had utilized a substantial portion of marital property in his name because of a major injury he had received, the cash which Mrs. Hallowell was to receive was apparently substantially less than she had anticipated. Consequently, if Mrs. Hallowell satisfied her obligation to Respondent for attorney's fees at the time of the marital settlement as provided in the Retainer Agreement, very little cash would be left for Mrs. Hallowell's personal use.

---

**2.** The Continental retirement plan interest was part of the benefits accruing to Mr. Hallowell from a class action suit by former employees against Continental. For purposes of this Opinion, references to the Continental retirement plan will include any other interest derived by Mr. Hallowell from the settlement.

"7.   As a result of negotiations, Mr. Hallowell agreed to pay $1,250.00 toward Respondent's fee. In addition, Respondent reduced her fees to Mrs. Hallowell by $817.50 [3], which reduced the fee balance to $1,000.00.

"8.   Respondent agreed to waive payment of the balance at the time of settlement and to accept payment of the balance at the rate of $100.00 per month from any distributions which Mrs. Hallowell received from Mr. Hallowell's retirement plan at Continental.

"9.   An amendment to the Retainer Agreement incorporating this revision to the fee payment arrangement was prepared and signed by Mrs. Hallowell and Respondent on or about May 3, 1995, (the "first amendment").... On the same date, Mrs. Hallowell executed on Assignment Of Proceeds ... in favor of Respondent, related to any distribution to Mrs. Hallowell through the class action litigation against Continental. The Assignment provided that:

'[Mrs. Hallowell] understands that this Agreement Of Proceeds does not relieve her of the responsibility of making any other payment that may be due on the above-described account according to her agreement with [Respondent].'

"10.   By the end of May, any remaining issues had been resolved between the Hallowells. Counsel submitted an order in the divorce case which was signed in the Circuit Court for Dorchester County on June 21, 1995 (the "divorce decree"). Under the divorce decree, Mr. Hallowell agreed to pay $1,250.00 toward Respondent's attorney's fee for representing Mrs. Hallowell and Mrs. Hallowell received $5,000.00, a car, and an interest in Mr. Hallowell's interests in the Continental and Fluor retirement plans. The divorce decree purported to serve as a Qualified Domestic Relations

---

**3.** The fee reduction was apparently made by Respondent to facilitate the settlement. No claim has been made that the fees charged by Respondent were unreasonable.

Order with respect to both the Continental and Fluor retirement plans.

"11. Respondent did not submit the form of the divorce decree to Continental or Fluor in advance of it being filed with the Court to determine if the companies would accept it as a Qualified Domestic Relations Order. She believed the companies would accept it as a Qualified Domestic Relations Order. She believed that they would do so.

"12. On June 23, 1995, two days following the Court's entry of the divorce decree, for the first time Respondent sent copies of the divorce decree to both Continental and Fluor. . . .

"13. Receiving no response from Fluor, Respondent sent a follow-up inquiry to Fluor on July 19, 1995. . . . On July 20, 1995, Respondent received a letter from Fluor dated July 14, 1995 . . . which said that the divorce decree was not acceptable to Fluor as a Qualified Domestic Relations Order and which enclosed a sample form for such an Order which would be acceptable.

"14. With respect to the Continental plan, Respondent believes that she talked to the special Master responsible for distributions who told her that the divorce decree was inadequate as a Qualified Domestic Relations Order. He was otherwise unhelpful. She states that she knew between her letter to the Master on June 23, 1995, and a follow-up letter to him on July 19, 1995, that he had a problem with the divorce decree serving as a Qualified Domestic Relations Order. However, she has no further recollection of the conversation. She has no notes which relate to the conversation.

"15. On July 19, 1995, she sent Continental's Special Master a follow-up letter . . ., but it was identical to the one sent to Fluor Corporation on the same date and did not reference the telephone conversation in which

he was alleged to have told her that the divorce decree was not acceptable as a Qualified Domestic Relations Order.

"16. Prior to the complaint in this case being filed by Mrs. Hallowell with the Attorney Grievance Commission, Respondent took no further action with respect to securing Mrs. Hallowell's interest in the Fluor or Continental retirement plans.

"17. On July 19, 1995, she also mailed or delivered to Mrs. Hallowell a letter and new Assignment Of Proceeds Form.... The new Assignment Of Proceeds was identical to that which was signed with the first amendment on May 3, except that it assigned to Respondent Mrs. Hallowell's distributions from Fluor Corporation. Mrs. Hallowell refused to sign it. Respondent explains that she sought the assignment of distributions from Fluor Corporation because she had concluded from the letter which she sent to the Special Master for Continental and an undocumented telephone conversation between them that it would be a 'Herculean task' to have Continental accept the divorce decree as a Qualified Domestic Relations Order.

"18. Respondent testified that she intentionally took no further action after July 19, 1995, to secure Mrs. Hallowell's interests in the Continental and Fluor retirement plans because Mrs. Hallowell refused to pay her for finalizing the Qualified Domestic Relations Orders to do so. She alleges that between signing the first amendment on May 3, 1995, and the entry of the divorce decree on June 21, 1995, Mrs. Hallowell made it clear to Respondent that Mrs. Hallowell did not think she should have to pay for additional work to get the Qualified Domestic Relations Orders finalized and was adamant that she would not pay additional legal fees; and during the period between the signing of the decree on June 21 and August 1, 1995, (when Mrs. Hallowell temporarily moved to Connecticut)

Mrs. Hallowell continued to refuse to pay additional fees and Respondent told her that she would do no more work unless Mrs. Hallowell agreed orally to pay for the additional work.

"19. Respondent acknowledges a conversation with Mrs. Hallowell in approximately December, 1995. Mrs. Hallowell said that Respondent acknowledged that the paperwork was on her desk and she would get to it as soon as she could. Respondent says that she told Mrs. Hallowell that the papers were on her desk and she would get them out if Mrs. Hallowell agreed to pay for the additional work. Respondent further said that she would have continued with the work if the additional Assignment Of Proceeds relating to the Fluor distribution had been signed because, although it would not have been the acknowledgment she was looking for that Mrs. Hallowell would pay for additional work, "it would have given [Respondent] a stronger position".

"20. Mrs. Hallowell testified that the first amendment on May 3,1995, resolved any issues regarding legal fees and that there was no further conversation about legal fees after that date. She denied being told by Respondent that she would do additional work only if Mrs. Hallowell recognized her obligation to pay the existing $1,000.00 debt and for any additional work. She said the only conversations she remembers after the signing of the decree was in July when Respondent told her that it was taking a long time to get a response from Continental and asking her to sign the additional Assignment Of Proceeds relating to Fluor; and in December, 1995, when they had a chance encounter at which Respondent told Mrs. Hallowell that she had been busy, that the papers were on her desk, and that she would "get on it".

"21. The Court finds as a matter of fact that there were conversations between Complainant and Respondent relating to the payment of fees which occurred prior

to the first amendment on May 3, 1995, and in the context of the manner and timing of payment for fees which had been incurred up to that time. However, the Court is not convinced that there were any discussions between the parties thereafter addressing the payment of fees for work which remained to be done following entry of the divorce decree, due perhaps to the fact that both Respondent and Mrs. Hallowell believed at the time the divorce decree was signed that the only thing which remained to be done was to mail copies of the divorce decree to Continental and Fluor.

"22. Clearly Mrs. Hallowell was, and perhaps still is, confused as to her responsibility for attorney's fees relating to any additional work related to the retirement plans. Mrs. Hallowell testified before the Inquiry panel and at this hearing in a contradictory manner, variously saying that future work would be at the hourly rate contained in the Retainer Agreement; the $1,000.00 balance on May 3 was to pay for getting the Qualified Domestic Relations Orders lodged with the two companies; and the $1,000.00 was for services rendered prior to May 3.

"23. Between the chance meeting with Respondent in December, 1995, and filing the complaint in this proceeding with the Attorney Grievance Commission in 1997, Mrs. Hallowell called Respondent about five times and visited her office twice to inquire as to the status of Respondent's efforts to secure Mrs. Hallowell's interests in the Continental and Fluor retirement plans. She also faxed Respondent a letter on September 18, 1997, . . . requesting action. Respondent's file reflects phone message forms dated January 23, 1996, and June 18, 1996, to Respondent. . . .

"24. Respondent did not respond to any of the calls or visits, including the 1997 fax, and did nothing further on the case after July, 1995. She did not take any action to withdraw from the case or to provide any

written notification to Mrs. Hallowell that she was doing no further work on the account, other than to send her periodic bills which reflected no work activity. Respondent said that she knew Mrs. Hallowell well enough to know, without talking with her, if the call was on a different matter or, as she assumed, that Mrs. Hallowell was calling to have her contribute 'hours and hours and hours of legal work without payment.' In hindsight, Respondent acknowledges that she should have responded to the contacts.

"25. As of the date of the hearing before this Court, Mrs. Hallowell's interest had not been secured in either of the retirement plans nor did she know what, if anything, she ever would receive.

"26. Since Mrs. Hallowell's complaint was filed with the Attorney Grievance Commission, Respondent and her counsel, with the approval of Bar Counsel and the consent of Mrs. Hallowell, have undertaken to obtain approval by Continental and Fluor of the divorce decree as a Qualified Domestic Relations Order. An amendment to the divorce decree will be required to satisfy the companies' requirements and Mr. Hallowell is contesting the amendment. Respondent and her counsel are proceeding with due diligence in that regard.

"27. Mrs. Hallowell's complaint was filed with the Attorney Grievance Commission on November 17, 1997. . . .

"28. A copy of the complaint was sent to the Respondent by Assistant Bar Counsel on November 18, 1997, requesting a response within 15 days. . . .

"29. Receiving no response, Assistant Bar Counsel sent a follow-up letter to Respondent on January 6, 1998, requesting a response within 10 days. . . .

"30. Still receiving no response, a letter was sent to Respondent on January 22, 1997, informing her that the complaint had been docketed and again requesting a response within 10 days.

"31.  On February 12, 1998, counsel for Respondent contacted Assistant Bar Counsel and since that time Respondent and her counsel have responded and followed up appropriately and have been actively and diligently pursuing securing Mrs. Hallowell's interest in the Continental and Fluor retirement plans.

"32.  Respondent acknowledged receiving the initial letter from the Assistant Bar Counsel on or about November 20, 1997. In explanation of her delay in responding until February 12, 1998, she said that the complaint came at the end of the year, she had just filed for divorce, had just received clearance from further follow up on cancer treatment she had received in 1994, and had put the matter aside until after the holidays because it had been a bad year generally and the complaint was hard to deal with.

"33.  Respondent was treated for anxiety and depression from 1990 to early 1992.

"34.  In late 1993, Respondent was diagnosed with breast cancer and had a lumpectomy in January, 1994, followed by radiation therapy. At the same time, her marriage was deteriorating. She was unable to work full-time following her surgery until shortly before the Hallowell domestic hearing in November, 1994.

"35.  She resumed psychotherapy in April, 1995, related to her marital relationship and concern with cancer. Respondent's husband left their home in November, 1995, and they were divorced in January, 1997. She continued periodic psychotherapy until early 1997 and continued on antidepressants. A report from her psychiatrist . . . dated February 19, 1999, reports that she 'is functioning well and has terminated psychotherapy.'

"36.  The Court is unable to conclude from the evidence submitted that Respondent's conduct was the result of or influenced by any mental condition, impairment or disability.

## "CONCLUSIONS OF LAW

"This Court finds from the above facts that Respondent violated the following Rules of Professional Conduct:

"1. *Rule 1.3 Diligence*

"Rule 1.3 provides that:

"A lawyer shall act with reasonable diligence and promptness in representing a client.

"Although Respondent appears to have acted with diligence and promptness in representing her client throughout the divorce proceeding up to, and including, correspondence to Continental and Fluor on July 19, 1995, she failed to do so thereafter by failing to take any further action to secure her client's interest in the Continental and Fluor retirement plans until several months following her client's complaint to the Attorney Grievance Commission in November, 1997.

"Respondent also violated Rule 1.3 by failing to explain adequately to her client that Respondent would not be taking any further action on the client's behalf. No written notification to that effect was given and, even if Mrs. Hallowell was informed orally, it should have become clear to Respondent over a course of time from the telephone calls, visits, and certainly the fax transmission on September 18, 1997, that Mrs. Hallowell did not understand that Respondent was no longer representing her. In this regard, the following Comment to Rule 1.3 is applicable:

"Doubt about whether a client-lawyer relationship still exists should be clarified by the lawyer, preferably in writing, so that the client will not mistakenly suppose the lawyer is looking after the client's affairs when the lawyer has ceased to do so."

"2. *Rule 1.4 Communication*

"Rule 1.4 provides that:

"(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.

"(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

"Respondent violated Rule 1.4(a) by failing to communicate with her client during the period from July 19, 1995, until after the client's complaint to the Attorney Grievance Commission in November, 1997 (other than one chance encounter in December, 1995) and in failing to respond to multiple telephone calls and visits, and to a fax request from her client throughout this period of time.

"Respondent violated Rule 1.4(b) by failing to communicate adequately to her client as set forth above under Rule 1.3 that she would not be taking further action on her client's behalf after July 19, 1995.

"3. *Rule 8.1 Bar Admission and Disciplinary Matters*

"Rule 8.1 provides that:

"An applicant for admission or reinstatement to the bar, or a lawyer in connection with a bar admission application or in connection with a disciplinary matter, shall not:

\* \* \*

"(b) fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter, or knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority, except that this Rule does not require disclosure of information otherwise protected by Rule 1.6.

"Respondent violated Rule 8.1(b) by knowingly failing to respond to Bar Counsel's requests in this matter from approximately November 20, 1997, until February 12, 1998. However, Bar Counsel represents that both Respondent and her counsel have been very active in their involvement since February 12, 1998, in attempting to resolve the retirement plan issues for Mrs. Hallowell."

Neither the petitioner nor the respondent has taken exceptions to the hearing court's findings of fact and conclusions of law. That leaves for determination the appropriate sanction to be imposed, a matter about which the parties are sharply divided.

In its Petitioner's Recommendation for Sanction, the petitioner recommends that the respondent be suspended from the practice of law for six months. In support of the recommendation, it argues:

"Respondent simply ceased performing any further work to secure proper Qualified Domestic Relations Orders for her client because the Complainant would not agree to a modification of the fee agreement. Respondent did not explain to her client that she had ceased working on her case. She did not answer her client's numerous letters and telephone messages regarding her case. As a result, Complainant still does not have valid QDROs for either plan, over four years after she was divorced. After the Complainant filed a complaint to the Petitioner, Respondent took almost three months before responding to the complaint."

Adding that the respondent's cessation of work on the client's case jeopardized the client's rights and that whether a loss ultimately will be incurred by the client has yet to be determined, the petitioner notes that the respondent has twice before been privately reprimanded, in 1988 and most recently in 1998. On the latter occasion, the sanction was for failure to protect a client's interest upon termination of representation and failing to respond to Bar Counsel's inquiries into the matter. In 1988, the private reprimand was issued in connection with the respondent's neglect of client matters due to her alcoholism, which is not now a problem or an issue in this case.

Responding with Respondent's Request For Remand[4] and Recommendation For Sanction, the respondent argues that a reprimand is the appropriate sanction.

---

4. The respondent's request for remand is premised on concern

In support of that request, the respondent proffered in mitigation "the difficulty and time burden facing Respondent in July 1995 when Respondent was informed by Complainant that Respondent would not be paid for any future work required to have the QDROs accepted", "that the record contains facts which prove that the Complainant took the position that she owed Respondent no additional fees for services rendered after the entry of the Judgment of Absolute Divorce, and that Complainant did not change that position until just prior to the close of the Inquiry Panel proceedings" (footnote omitted),[5] and the testimony of Richard Vincent, Director of the Lawyer Assistance Program of the Maryland State Bar Association. According to Mr. Vincent,

"Ms. Tolar has been and continues to be an invaluable asset to the committee for which I work. She is well known and in my opinion very well respected to the Eastern Shore. And is quote unquote "my man in Havana," if you will. The person to whom I turn when I need verification, evaluation, identification of attorneys who have been referred as possibly having some sort of difficulties.

"I use her continuously because, as I said before, of the respect that I think she has acquired on the whole Eastern Shore."

"The purpose of disciplinary proceedings against an attorney is to protect the public rather than to punish the erring attorney." *Attorney Griev. Comm'n v. Hamby*, 322 Md. 606, 611, 589 A.2d 53, 56 (1991). That purpose is achieved "when sanctions are imposed that are commensurate with the

---

"that Rule 16–711.b.3 may be read as to prevent oral argument being held by this [C]ourt, since neither party has filed exceptions, but only recommendations. If the Rule were so interpreted, the [C]ourt would not have before it (either in the transcript or in oral argument) the testimony of Respondent's character witnesses."
We do not so interpret Rule 16–711.b.3. Accordingly, the request for remand is denied.

**5.** Although purporting not to be, this item of mitigation is in actuality a challenge to and contradiction of the hearing court's findings of fact. Therefore, we have not considered it in reaching our decision.

nature and gravity of the violations and the intent with which they were committed." *Attorney Griev. Comm'n v. Awuah,* 346 Md. 420, 435, 697 A.2d 446, 454 (1997). Thus, the facts and circumstances of the case before the Court determine the sanction to be imposed. *Attorney Griev. Comm'n v. Ober,* 350 Md. 616, 631–32, 714 A.2d 856, 864 (1998); *Hamby,* 322 Md. at 611, 589 A.2d at 56. Stated differently, we have made clear that the nature and extent of the discipline imposed is dependent on the severity of the attorney's misconduct and the particular facts of the case. *Attorney Griev. Comm'n of Maryland v. Pennington,* 355 Md. 61, 78, 733 A.2d 1029, 1037–38 (1999); *Attorney Griev. Comm'n of Maryland v. Milliken,* 348 Md. 486, 519, 704 A.2d 1225, 1241 (1998); *Attorney Griev. Comm'n v. Montgomery,* 318 Md. 154, 165, 567 A.2d 112, 117 (1989). Of course, the Court " 'may consider facts in mitigation. . . .' " *Attorney Griev. Comm'n v. Kenney,* 339 Md. 578, 587, 664 A.2d 854, 858 (1995) (quoting *Attorney Griev. Comm'n v. Pollack,* 279 Md. 225, 238, 369 A.2d 61, 68 (1977)). A factor to be considered, and one that is present in the case sub judice, is the respondent's remorse for her misconduct. *Attorney Griev. Comm'n v. Wyatt,* 323 Md. 36, 38, 591 A.2d 467, 468 (1991).

█ Under the facts and circumstances of this case, we believe that a reprimand, rather than a suspension, is the appropriate sanction. It will serve the purpose of protecting the public just as well as a short suspension, the sanction advocated by the petitioner. Being a reported reprimand, the reprimand in this case, unlike the two prior private ones by the Review Board, will forever be recorded among the reported opinions of this Court. *Attorney Griev. Comm'n v. Kemp,* 303 Md. 664, 681, 496 A.2d 672, 680 (1985). *See e.g., Attorney Griev. Comm'n v. Manning,* 318 Md. 697, 569 A.2d 1250 (1990); *Attorney Griev. Comm'n v. Heinze,* 293 Md. 193, 197, 442 A.2d 570, 572 (1982).[6]

---

**6.** Subsequent to the hearing conducted in this matter, the Court has been advised by the Respondent's counsel, with the agreement of the petitioner, through Assistant Bar Counsel, that the Qualified Domestic

IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–715, FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST JANE K. TOLAR.

Because of the prior private reprimands, Judge Raker would impose a 30 day suspension.

Relations Orders have been prepared by the Respondent and that, after a hearing at which opposition to the orders was heard, the trial court indicated that it would sign the orders.