768 A.2d 607

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND,**

v.

**Jack A. BERNSTEIN.**

**No. 8, Sept. Term, 2000.**

Court of Appeals of Maryland.

March 8, 2001.

Melvin Hirshman, Bar Counsel and Dolores O. Ridgell, Assistant Bar Counsel for the Attorney Grievance Commission of Maryland, for petitioner.

Howard L. Cardin, Baltimore, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL, and BATTAGLIA, JJ.

RAKER, Judge.

The Attorney Grievance Commission, acting through Bar Counsel, filed a petition for disciplinary action against Jack A. Bernstein (Respondent), alleging violations of the Maryland Rules of Professional Conduct and the Business Occupations and Professions Article. The Commission charged Respondent with violating Rules 1.5 (Fees),[1] 1.15 (Safekeeping prop-

---

1. Maryland Rule 1.5 (Fees) states, in pertinent part:

(c) A fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee is prohibited by paragraph (d) or other law. The terms of a contingent fee agreement shall be communicated to the client in writing. The communication shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal, litigation and other expenses to be deducted from the recovery, and whether such expenses are to be deducted before or after the contingent fee is calculated. Upon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement stating the outcome of

erty),[2] 8.1 (Bar admission and disciplinary matters),[3] 8.4 (Misconduct),[4] 16–604 (Trust account-Required deposits),[5] 16–606

the matter, and, if there is a recovery, showing the remittance to the client and the method of its determination.

**2.** Maryland Rule 1.15 (Safekeeping property) states, in pertinent part:

(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and of other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

(b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement .with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

**3.** Maryland Rule 8.1 (Bar admission and disciplinary matters) states, in relevant part:

[A] lawyer in connection with ... a disciplinary matter shall not:

\* \* \* \* \* \*

(b) knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority, except that this Rule does not require disclosure of information otherwise protected by Rule 1.6.

**4.** Maryland Rule 8.4 (Misconduct) states, in pertinent part:

It is professional misconduct for a lawyer to:

\* \* \* \* \* \*

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice....

**5.** Maryland Rule 16–604 (Trust account—Required deposits) states:

Except as otherwise permitted by rule or other law, all funds, including cash, received and accepted by an attorney or law firm in this State from a client or third person to be delivered in whole or in part to a client or third person, unless received as payment of fees owed the attorney by the client or in reimbursement for expenses properly advanced on behalf of the client, shall be deposited in an attorney trust account in an approved financial institution. This Rule does not apply to an instrument received by an attorney or law firm that is made

(Name and designation of account),[6] 16–607 (Commingling of funds),[7] and 16–609 (Prohibited transactions).[8] The Commission further charged Respondent with violating § 10–306 (Misuse of trust money)[9] of the Business Occupations and Professions Article. Pursuant to Maryland Rule 16–709(b), we referred the charges to Judge Kathleen O'Ferrall Friedman of the Circuit Court for Baltimore City to conduct a hearing and make findings of fact and conclusions of law.

After conducting an evidentiary hearing, Judge Friedman concluded that Respondent had violated Rules 1.5, 1.15, 8.1(b), 8.4(c) and (d), 16–606, 16–607, 16–609, and § 10–306 of the Business Occupations and Professions Article, but that Respondent had not violated Rule 16–604. In this Court, Respondent excepted to Judge Friedman's conclusion that he had

---

payable solely to a client or third person and is transmitted directly to the client or third person.

**6.** Maryland Rule 16–606 (Name and designation of account) states:

An attorney or law firm shall maintain each attorney trust account with a title that includes the name of the attorney or law firm and that clearly designates the account as "Attorney Trust Account," "Attorney Escrow Account," or "Clients' Funds Account" on all checks and deposit slips. The title shall distinguish the account from any other fiduciary account that the attorney or law firm may maintain and from any personal or business account of the attorney or law firm.

**7.** Maryland Rule 16–607 (Commingling of funds) states, in pertinent part:

a. **General prohibition.** An attorney or law firm may deposit in an attorney trust account only those funds required to be deposited in that account by Rule 16–604 or permitted to be so deposited by section b. of this Rule.

**8.** Maryland Rule 16–609 (Prohibited transactions) states:

An attorney or law firm may not borrow or pledge any funds required by these Rules to be deposited in an attorney trust account, obtain any remuneration from the financial institution for depositing any funds in the account, or use any funds for any unauthorized purpose. An instrument drawn on an attorney trust account may not be drawn payable to cash or to bearer.

**9.** Business Occupations and Professions Article, § 10–306 (Misuse of trust money) states:

A lawyer may not use trust money for any purpose other than the purpose for which the trust money is entrusted to the lawyer.

violated Rule 8.4. Bar Counsel took no exceptions to Judge Friedman's findings of fact or conclusions of law.

## I.

Following an evidentiary hearing, Judge Friedman filed a memorandum detailing her findings of fact and conclusions of law. We set forth Judge Friedman's memorandum below.[10]

"The Attorney Grievance Commission ("Petitioner") acting through Bar Counsel filed a Petition for Disciplinary Action against Jack A. Bernstein ("Respondent"), alleging misconduct relating to a checking account with Crestar Bank and the mishandling of client funds. The Court of Appeals referred this matter to this court for a fact finding hearing.

"The hearing began on July 28, 2000 and continued to September 5, 2000. Both Petitioner and Respondent filed proposed findings of fact and conclusions of law. Upon the evidence presented, the Court makes the following findings of fact and conclusions upon clear and convincing evidence.

### Findings of Fact and Conclusions

"Respondent, Jack Bernstein, is 45 years old and has been engaged in the practice of law since being admitted to the Maryland Bar on November 15, 1978. During the time relevant to this matter, he maintained an office for the practice of law at 5 Light Street, Baltimore, Maryland until April 1999 when he relocated to his current address at 110 St. Paul Street, Baltimore, Maryland.

"Respondent graduated from the University of Maryland School of Law with a high grade point average. He passed the bar examination on his first attempt and during his undergraduate studies, he took and passed one introductory accounting course.

"Respondent opened a checking account with Crestar Bank titled "Maryland Legal Services, Jack A. Bernstein,

---

10. The footnotes are omitted.

Esq., IOLTA" ("the account"). On four separate occasions, the Petitioner received a notice of an overdraft from Crestar Bank as follows: September 11, 1997, September 15, 1997, January 29, 1998, and February 17, 1998. These notices brought about the investigation resulting in the Petition for Disciplinary Action.

"The overdrafts occurred as follows:

1. September 8, 1997, check number 811 in the amount of $90.00 to the order of the Circuit Court for Howard County.

2. September 9, 1997, check number 812 in the amount of $5.00 to the order of the Circuit Court for Howard County.

3. January 23, 1998, check number 900 in the amount of $885.90 to the order of Federal Express.

4. February 10, 1998, check number 923 in the amount of $500.00. (This check never cleared; the payee is unknown.)

"There have been no further overdrafts with the account which Respondent closed. Respondent then opened an account with First Mariner Bank; there have been no overdrafts with that account to the date of the hearing before this Court.

*Failure to Respond to Lawful Demand for Information and to Provide Adequate Information*

"On September 11, 1997, Melvin Hirshman, Bar Counsel ("Bar Counsel") sent a letter to Respondent notifying him of the first overdraft and requesting a full explanation. Bar Counsel further requested Respondent provide within 10 days his client ledger cards, deposit slips, canceled checks, and monthly bank statements for the period April through September 1997. Respondent received the letter on September 12, 1997, but did not respond within 10 days as required.

"After the second notice of the overdraft was received, Bar Counsel sent to Respondent another letter dated September 15, 1997, which was received September 17, 1997.

This letter requested a full explanation of the overdraft and that Respondent provide his client ledger cards, bank deposit slips, canceled checks and monthly bank statements.

"On September 25, 1997, Bar Counsel received a letter from Respondent. The correspondence included copies of bank statements for the period April through August 1997, but did not include canceled bank checks and bank deposit slips as requested. Respondent indicated in his letter that the overdraft occurred because he advanced court costs without depositing corresponding sums due to the unusual strain of activity caused by preparation for his daughter's Bat Mitzvah on August 30, 1997.

"By a letter dated September 29, 1997, Bar Counsel again requested more information and documentation relating to the overdrafts. Specifically, Bar Counsel requested the September bank statement and the documents related to Respondent's explanation of the overdraft.

"On October 23, 1997, Bar Counsel received a response from Respondent, dated October 22, 1997, in which he repeated the same explanation given in his previous letter and included a copy of the September 1997 bank statement. The letter did not include any of the other requested documents such as canceled bank checks and bank deposit slips.

"At this point, Bar Counsel docketed a complaint, and on October 29, 1997, notified Respondent by letter. Bar Counsel again requested copies of canceled checks, client ledger cards, bank deposit slips and any other information that would assist in identifying deposits and disbursements for the period April through September 1997. Respondent was asked to respond within fifteen (15) days of the date of the letter. Respondent did not respond to the letter of October 29, 1997.

"On November 26, 1997, Bar Counsel sent another letter to Respondent to provide the previously requested information within 10 days of the letter. Respondent failed to respond in a timely manner to the letter of November 26, 1997.

"On December 17, 1997, the Petitioner received a letter dated December 22, 1997, but postmarked December 16, 1997, from Respondent in which he asked to meet to discuss the matter and indicated that the requests were overbroad and not focused on any issues raised.

"On February 2, 1998, Bar Counsel sent another letter to Respondent which notified him of the third overdraft and requested documentation for the period August 1997 through January 1998. Respondent received the letter on February 3, 1998, but he did not respond in a timely manner.

"On February 19, 1998, another letter was sent to Respondent, which notified him of the fourth overdraft and requested documentation of the period September 1997 through February 1998 within ten (10) days of the receipt of the letter. Respondent did not respond to the letter of February 19, 1998.

"On March 16, 1998, Assistant Bar Counsel, Delores O. Ridgell, ("Assistant Bar Counsel") sent a letter to Respondent, which again requested a response within 10 days with an explanation for the overdrafts and documentation on the bank account.

"On March 16, 1998, Bar Counsel received a letter from Respondent dated March 13, 1998. In this letter, Respondent requested a meeting and enclosed bank statements for January and February 1998. Respondent provided no other documentation.

"Respondent's explanation for the January 1998 overdraft was that he had been assured by a bank teller that it had . cleared. His explanation for the February 1998 overdraft was that it was a cascade of the prior overdraft. Respondent did not identify the payee of check number 923 (the February overdraft) nor provide Bar Counsel with the reason for the issuance of this check.

"At trial, Respondent testified that check number 923 was paid, but the bank records through March 31, 1998 do not reflect payment of the check. Respondent has not provided

documentary evidence to corroborate that payment was made nor has he identified the intended recipient of the check.

"On March 17, 1998, Bar Counsel sent a letter in response to Respondent's letter of March 13, 1998. This letter contained another request for records as previously requested in Bar Counsel's letter of March 16, 1998 to Respondent.

"On March 27, 1998, Respondent met with Assistant Bar Counsel and Commission Paralegal John DeBone at the Attorney Grievance Commission office. Respondent brought no documents to the meeting.

"In response to a subpoena to Crestar Bank, Bar Counsel received canceled checks and deposit slips from the account. Neither the checks nor the deposit slips indicated a trust account. At the March 27 meeting, Respondent was shown summaries of the bank records. He was asked again to provide documentation.

"During the March 27 meeting, Mr. DeBone provided Respondent with a hypothetical model of the records which should be kept for an attorney trust account. (Petitioner's Exhibit 31.) Nevertheless, Respondent admitted that he took no corrective steps and continued to keep no records prior to the hearing conducted by the Inquiry Panel on December 7, 1999. At the Inquiry Panel Hearing, Respondent denied receiving this information.

"On May 15, 1998, Assistant Bar Counsel sent another letter to Respondent which requested information related to several transactions identified during the review of the bank records on March 27, 1998. He was asked to respond within fifteen (15) days.

"By telephone, Respondent requested and was granted an extension until June 15, 1998. A response was not received by June 15, 1998, and on June 19, 1998, a letter was sent to Respondent which again requested a response. However, on July 6, 1998, by letter dated June 30, 1998, Respondent provided some of the requested bank records. Respondent, by his own admission, kept no records except a calendar of

fees. He provided to Assistant Bar Counsel only a few settlement sheets.

"On July 10, 1998 and August 28, 1998, letters requesting the information not provided were sent to Respondent. Respondent did not provide a timely response to either the July 10 or August 28, 1998 requests.

"On October 28, 1998, Respondent again met with Assistant Bar Counsel and John DeBone. Respondent brought no documents and took no notes during the meeting. On November 10, 1998, Assistant Bar Counsel sent a letter to Respondent memorializing the meeting of October 28, 1998.

"This Court concludes that Respondent failed to respond in a timely fashion to the reasonable inquiries by Bar Counsel to provide the requested documents and records and to provide adequate explanations of the overdrafts in violation of Rule 8.1(b) of the Maryland Rules of Professional Conduct.

"The Petitioner's requests were related to an investigation within the authority of the Attorney Grievance Commission and Bar Counsel. Respondent failed to provide the canceled checks requested by Bar Counsel and calendar/calendars referred to at the Inquiry Panel as well as check stubs referred to at the hearing before this Court. Although he eventually provided a few settlement sheets and the creditors reports he filed for Cobb Financial (Petitioner's Exhibits 21 and 25), he did not respond in a timely fashion and only after several requests by the Petitioner. Respondent never identified the client matters which entitled him to the cash disbursements listed in Petitioner's Exhibit 28, nor did he identify the source/sources of the cash deposits as requested at the meeting on October 28, 1998 and by letter dated November 10, 1998.

"In his letter dated December 22, 1997, Respondent suggested that the requests were over broad, but at no time did he provide authority for this assertion. At the hearing before this Court, he stated that he did not provide the requested documents because he did not have them. Yet documents that he did maintain, such as monthly bank

statements and canceled checks, he did not produce in a timely manner. At the hearing, Respondent gave another reason for why he did not respond to Bar Counsel's requests: He stated, in so many words, that he did not perceive the Attorney Grievance Commission process as a prosecutorial proceeding, but rather one in which lawyers would receive assistance to achieve resolution of the inquiry.

"Respondent's explanation for the overdrafts was not satisfactory because the actual reason for the overdrafts was his failure to maintain proper records and his inadequate accounting system. Had he maintained the account properly, he would have known whether there were sufficient funds in the account to cover a withdrawal.

*Failure to Communicate Contingent Fee Agreement in Writing*

"Respondent handled personal injury and collection cases and used contingency fee agreements in those matters. He deposited the settlement checks for those cases to the account. Respondent, by his own admission at the hearing before this Court, failed to communicate the terms of contingency fee agreements to his clients in writing. He testified that he did not know he was required to have written contingency fees. Respondent admitted allowing fees earned in these contingency fee cases to accrue in the account for an indefinite period of time. There were no regular bank charges on this account which would require the deposit of Respondent's personal funds to the account.

"The Court concludes that Respondent failed to communicate the terms of contingency fee agreements to his clients in writing in violation of Rule 1.5 of the Maryland Rules of Professional Conduct. The fact that he was ignorant of the requirement is no excuse.

*Failure to Safekeep Property of Clients*

"Respondent used the account in question to deposit funds he received in connection with the representation of his clients. He did not maintain a check register for the account. Moreover, he acknowledged that, although he

knew since 1983 that a trust account is required, it was not his practice to promptly withdraw fees earned following settlement of contingency fee matters and that he would allow his personal funds to accrue in the trust account for an indefinite period of time.

"Respondent also failed to maintain this account as required by Title 16, Chapter 600 of the Maryland Rules and did not keep complete records of the client and/or third party funds deposited and disbursed from this account. He admitted that he kept no records regarding funds received and deposited into the account on behalf of a client identified as Cobb Financial, Inc. He asserted that he adopted the practices and procedures of several law firms with which he has been associated over the years.

"Respondent's failure to keep an adequate balance in the account caused a delay in the receipt of funds to which Federal Express, the third party subrogee of Crystal Brown Barnes, was entitled. It was necessary for check number 900 to be presented a second time on January 30, 1998 in order for the third party to obtain payment.

"Also, check number 859 payable to Litofsky, Brager & O'Brien LLC on behalf of clients identified as Deb and Roger Jones was not issued, according to the date on the check, until November 12, 1997. It was not presented until November 20, 1997, at which time it cleared. Respondent, however, waited almost two weeks after the other disbursements for these checks before he wrote check number 859. The other disbursements are dated October 30, 1997, and cleared the bank October 31 and November 4, 1997. The settlement sheet provided to these clients is dated October 28, 1997 and reflects the disbursement of payment to Litofsky, Brager & O'Brien as well as the other disbursements. (Petitioner's Exhibit 21.) Had check number 859 been presented prior to the deposit of $4,500 which was posted to the account on November 13, 1997, it would not have cleared.

"Respondent testified that it was his belief that check number 923 in the amount of $500, which failed to clear the

bank when first presented on February 10, 1998, was eventually paid. The bank records do not reflect the payment of this check through March 31, 1998, the point at which time the Petitioner's review of the bank records ended. Payment to the client or third party entitled to check number 923 was delayed approximately six weeks.

"The Court concludes that Respondent violated Rule 1.15(a) and Rule 1.15(b) of the Maryland Rules of Professional Conduct. He failed to keep clients' funds separate from his own and failed to keep complete records of such funds in violation of Rule 1.15(a). Respondent withdrew funds from the account and failed to provide an adequate explanation of the use of the funds in violation of Rule 1.15(b).

*Trust Account–Required Deposits*

"Respondent made deposits to the account in the form of cash. Although he provided no explanation of these deposits, Petitioner presented no evidence that any of the deposits were funds other than those received in trust. This Court concludes that there is no violation of Rule 16–604 of the Maryland Rules regarding Attorney Trust Accounts.

*Failure to Properly Name and Designate Account*

"Respondent opened the account titled "Maryland Legal Services, Jack A. Bernstein, Esquire, IOLTA." He used the account as a client funds/trust account. The checks and deposit tickets for the account bear only Respondent's name and the address of his office without any of the three required designations: "Attorney Trust Account," "Attorney Escrow Account," or "Clients' Funds Account." On the date of the hearing before this Court, his current account with First Mariner, by Respondent's own admission, was not titled properly. (See Petitioner's Exhibits 30, 32 and 33.) Subsequently, by way of a Motion to Alter and Amend and a Notice of Filing Amended Answer to Discovery, Respondent submitted proof that the First Mariner account is now properly titled, "Jack A. Bernstein, Attorney, Escrow Account." The Court concludes that Respondent violated

Rule 16–606 of the Maryland Rules regarding Attorney Trust Accounts.

"There is no evidence that Respondent charged unreasonable fees. The account records and Respondent's testimony show that the withdrawals for fees were approximately one-third of the settlement amount obtained.

*Commingling of Personal and Client Funds in the Account*

"Respondent commingled personal and client funds in the account. Respondent acknowledged that he failed to withdraw promptly earned fees from settlement proceeds in personal injury cases and left the funds in the account for an indefinite period of time.

"This Court concludes that Respondent violated Rule 16–607 of the Maryland Rules regarding Attorney Trust Accounts.

*Withdrawal of Funds from Trust Account Payable to Cash*

"Bank records reveal that Respondent withdrew funds from the account by way of checks payable to "cash." He received the proceeds of these checks and would usually deposit the checks to his personal bank account. Respondent testified that he received these funds as payment of fees, but he failed to identify the client matters to which the disbursements related. Likewise, he failed to identify the sources of funds deposited as cash into the account.

"The Court concludes that Respondent withdrew funds from the account by check made payable to cash in violation of Rule 16–609 of the Maryland Rules regarding Attorney Trust Accounts.

"Respondent failed to maintain in trust the funds he received on behalf of a client identified as Crystal Brown Banes. The third overdraft notice was issued when check number 900, in the amount of $885.90 (payable to the third party subrogee on behalf of this client) was presented by the payee, Federal Express.

"This occurred at the time that Respondent was already under investigation as a result of prior overdrafts. He had also indicated in a letter dated October 10, 1997, that he was

reconciling the account twice a month. (Petitioner's Exhibit 8.) This check, dated December 22, 1997, was first presented January 23, 1998. On that date, the balance in the account was a little over $600. Respondent wrote checks to cash and received the proceeds of these checks while check number 900 was outstanding. Check number 900 eventually cleared the account on January 30, 1998 as the result of a deposit made in the amount of $3,000 on January 28, 1998. The deposit was an insurance check payable to another of Respondent's clients, Mary Bryant. Thus one client's obligation was paid from funds received on behalf of another client.

"Respondent's explanation for the January 1998 overdraft is that he was told by a bank employee that there was money in the account and he believed that he was entitled to withdraw funds as payment of fees during this period of time. The disbursement which caused the account balance to fall below the trust obligation of $885.90 on January 22, 1998 was check number 918 written to cash in the amount of $450. Respondent produced no internal records on which he relied to determine that he was entitled to withdraw fees in this amount on that date. Nor was there a deposit prior to the disbursement of check number 918 which would have entitled Respondent to a fee on January 22, 1998. At the hearing, Respondent was unable to identify any client matter which would have entitled him to withdraw the funds he did in January 1998.

"Nor was this an isolated incident. The evidence demonstrated that the account balance fell below the trust obligations owed to clients identified as David Pistorio, in June 1997, and Deb & Roger Jones, in November 1997. (Petitioner's Exhibits 32 and 33.) The timing of the disbursements for the Joneses provides evidence that Respondent intentionally delayed paying the Jones' creditor for almost two weeks until after the deposit of a check received on behalf of another client had been made. For instance, the Jones' settlement checks totaling $3,200 were posted to the account on October 28, 1997. Respondent made three dis-

bursements for these clients, one to the Joneses and two to medical care providers on their behalf. (Petitioner's Exhibit 21.) Although two of these disbursements are dated October 30, 1997 and cleared the account on October 31 and November 4, 1997, respectively, the third disbursement, check number 859 in the amount of $1,000, was written by Respondent on November 12, 1997. It was not presented until November 20, 1997. By then it cleared because a deposit of $4,500 was made on November 4 and posted to the account on November 13, 1997. The $4,500 deposit was an insurance check received on behalf of a client identified as Satterfield. Had check number 859 been presented prior to the deposit of $4,500, it would not have cleared.

"Respondent was put on notice September 1997 that there was a problem with the account. Yet he made no effort to correct his handling of trust money, continued to withdraw amounts from the accounts, and continued to claim he had no records.

"This Court concludes that Respondent's failure to hold funds owed to clients and third parties in trust was willful and in violation of the Business Occupations and Professional Article § 10–306.

*Conduct Involving Dishonesty, Fraud, Deceit or Misrepresentation*

"At the Inquiry Panel December 7, 1999, Respondent testified that he did not know until the night before the Inquiry Panel hearing that he was supposed to have written fee agreements in contingency fee cases and did not know that writing checks to cash on a trust account was prohibited. The evidence shows that Assistant Bar Counsel addressed these matters with him during both the meetings on March 27, 1998 and October 28, 1998, with Mr. DeBone and Assistant Bar Counsel. Respondent also denied receiving this hypothetical model from Mr. DeBone during his March 27, 1998 meeting. At the hearing before this Court, Respondent reiterated that he did not recall receiving the hypothetical model. In his letters to Bar Counsel on September 25 and December 22, 1997, Respondent did not

reveal that some of the records being requested such as deposit tickets and client ledger cards did not exist.

"Respondent failed to cooperate during the investigation, testified falsely at the Inquiry Panel hearing and failed to provide information and documents requested during discovery. This Court concludes that Respondent violated Rule 8.4(c) of the Maryland Rules of Professional Conduct and that his conduct showed a disregard for the disciplinary process in violation of Rule 8.4(d) which prohibits a lawyer from engaging in conduct prejudicial to the administration of justice."

## II.

We turn first to Respondent's exception. Respondent excepts to the hearing judge's conclusion that he violated Rule 8.4 by failing to cooperate with Bar Counsel, testifying falsely before the Inquiry Panel, and failing to provide information and documents requested during discovery. The burden is on Respondent to prove factual matters in defense of his position by a preponderance of the evidence. *See Attorney Grievance v. Sheridan,* 357 Md. 1, 17–18, 741 A.2d 1143, 1152 (1999). Other than a bare statement noting that he excepts to the finding with regard to Rule 8.4, Respondent has offered no reasons as to why the hearing judge was incorrect. Respondent has failed to meet his burden. *See Attorney Grievance Comm'n v. Shaw,* 363 Md. 1, 12–14, 766 A.2d 1028, 1034 (2001); *Sheridan,* 357 Md. at 17–18, 741 A.2d at 1152.

Judge Friedman considered the evidence presented by Respondent and Bar Counsel, and after observing and listening to the witnesses as they testified, she chose to believe the evidence of Bar Counsel. The trier of fact may pick and choose which evidence to rely upon. *See Attorney Griev. Comm'n v. Gavin,* 350 Md. 176, 190, 711 A.2d 193, 200 (1998). The hearing judge's findings of fact are prima facie correct, and will not be disturbed unless they are clearly erroneous, giving due regard to the hearing judge's opportunity to assess the credibility of the witnesses first hand. *See id.* at 190, 711

A.2d at 200. We conclude that the hearing judge's factual findings were not clearly erroneous. The exception is overruled.

## III.

 We now turn to the appropriate sanction. In so doing, we recognize that the purpose of disciplinary sanctions is to protect the public, to protect the integrity of the legal profession and to deter other lawyers from violating the Rules of Professional Conduct, not to punish the erring attorney. *See Attorney Grievance v. Koven,* 361 Md. 337, 343, 761 A.2d 881, 884 (2000). The facts and circumstances of each case will determine the appropriate sanction. *See Attorney Grievance v. Tolar,* 357 Md. 569, 585, 745 A.2d 1045, 1053 (2000).

Bar Counsel urges this Court to disbar Respondent. As support for this recommendation, Bar Counsel emphasizes that Respondent's actions were not the result of negligence and that the hearing judge's factual findings demonstrate that Respondent willfully misappropriated client funds. Bar Counsel argues that disbarment is the appropriate sanction where the attorney willfully misappropriates client funds. Respondent recommends a limited suspension as the appropriate sanction and notes that Bar Counsel has failed to produce any evidence of harm suffered by any person or entity other than the check drawn to Federal Express.

We have held consistently that "[m]isappropriation of funds by an attorney is an act infested with deceit and dishonesty and ordinarily will result in disbarment in the absence of compelling extenuating circumstances justifying a lesser sanction." *Attorney Griev. Comm'n v. Bakas,* 323 Md. 395, 403, 593 A.2d 1087, 1091 (1991). *See Attorney Griev. Comm'n v. White,* 328 Md. 412, 417, 614 A.2d 955, 958 (1992); *Attorney Griev. Comm'n v. Ezrin,* 312 Md. 603, 608–09, 541 A.2d 966, 969 (1988); *Attorney Griev. Comm'n v. Cockrell,* 304 Md. 379, 393–94, 499 A.2d 928, 935 (1985). Such a sanction is justified because attorneys:

must remember that the entrustment to them of the money and property of others involves a responsibility of the highest order. They must carefully administer and account for those funds. Appropriating any part of those funds to their own use and benefit without clear authority to do so cannot be tolerated.

*Attorney Griev. Comm'n v. Owrutsky,* 322 Md. 334, 345, 587 A.2d 511, 516 (1991). In *Bar Ass'n v. Marshall,* 269 Md. 510, 519, 307 A.2d 677, 682 (1973), this Court asserted that:

it is essential that all members of the legal fraternity be strongly and constantly impressed with the truism that in handling moneys and properties belonging to their clients or others that they accept them in trust and are strictly accountable for their conduct in administering that trust, so they dare not appropriate those funds and properties for their personal use. The misappropriation by an attorney of funds of others entrusted to his care, be the amount small or large, is of great concern and represents the gravest form of professional misconduct.

Judge Friedman concluded that Respondent willfully misappropriated client funds, noting that Respondent's client trust account fell below its trust obligation in January 1998 as the result of Respondent's withdrawal of funds payable to "cash" while issued checks were outstanding. Addressing Respondent's explanation for falling below his trust obligation—that he was told by a bank teller that there was money in the account, and Respondent believed he was entitled to withdraw fees—Judge Friedman noted that Respondent produced no records on which he relied to determine that he was entitled to any fees at that time. Nor did the account show a deposit that would entitle Respondent to fees prior to his withdrawal of those fees. Moreover, Judge Friedman found that Respondent was unable to identify any client matter that would have entitled him to withdraw the funds he withdrew in January 1998. Judge Friedman further highlighted one transaction, *i.e.,* the Jones' account, where Respondent intentionally used the funds belonging to one client to pay the obligations of another client. These findings are not clearly erroneous.

We consider Respondent's failure to attempt to rectify his handling of the trust account as an aggravating factor. Judge Friedman found that Respondent was on notice of problems with the trust account as early as September of 1997, but made no attempt to correct his handling of trust money, continued to withdraw amounts from the account improperly, and continued to claim he had no records documenting the transactions. Respondent continued to operate his trust account in the same manner after receiving from Bar Counsel in March of 1998 a hypothetical model of the proper maintenance of a trust account. After receiving the model, Respondent had over eight months before the Inquiry Panel hearing commenced in which to institute the proper procedures for his trust account, but he failed to do so. Even absent such specific assistance, every attorney is deemed to know the Rules of Professional Conduct and is charged with the knowledge of how to operate and maintain a trust account. *See* Rule 16–601 *et seq. See also Attorney Grievance Comm. v. Awuah,* 346 Md. 420, 435, 697 A.2d 446, 454 (1997). We have made clear that neither ignorance of ethical duties nor ignorance of bookkeeping requirements is a defense in disciplinary proceedings, although a finding with respect to intent with which a violation was committed may have a bearing on the appropriate sanction. *See id.* In the instant case, Respondent acted intentionally, and not merely negligently. Respondent knew that he was invading client funds.

Respondent's conduct is further aggravated by his failure to cooperate with Bar Counsel and his failure to produce records from the trust account to aid Bar Counsel's investigation. The failure to cooperate with Bar Counsel is a serious violation. *See Attorney Griev. Comm'n v. Fezell,* 361 Md. 234, 255–56, 760 A.2d 1108, 1109 (2000).

Judge Friedman found that Respondent failed to respond to lawful demands of Bar Counsel on at least seven separate occasions. Further, Judge Friedman found that Respondent did not produce the canceled checks, calendars used to record fees, and check stubs he referred to throughout his testimony before the Inquiry Panel and the hearing judge. The *few*

settlement sheets, bank statements, and canceled checks that Respondent provided to Bar Counsel were not provided in a timely fashion and only after several requests from Bar Counsel.

As mitigation, Respondent asserts that, other than the check payable to Federal Express that had to be presented twice, Bar Counsel has produced no evidence of harm suffered as a result of his conduct. This Court, however, has stated that the rule against misappropriation is "concerned with the risk of loss, not only the actual loss." *Glenn*, 341 Md. at 489, 671 A.2d at 483. This is so because, *inter alia*, the failure to keep client funds separate subjects client monies to the claims of the attorney's creditors. *See id. See also Attorney Griev. Comm'n v. Goldberg*, 292 Md. 650, 658, 441 A.2d 338, 342 (1982) (noting that although the attorney was fortunate that there was no actual loss to the client by virtue of the negative balances in the escrow account, the public must be protected).

Respondent willfully misappropriated funds from his client trust account and commingled his personal funds with those of his clients. We have stated time and again that misappropriation of client funds alone will result in disbarment in the absence of compelling extenuating circumstances. *See, e.g., Attorney Griev. Comm. v. Milliken*, 348 Md. 486, 519, 704 A.2d 1225, 1241 (1998); *Attorney Griev. Comm'n v. White*, 328 Md. 412, 417, 614 A.2d 955, 958 (1992). Respondent has not demonstrated any such compelling circumstances in this case. Additionally, the gravity of Respondent's conduct is compounded by other numerous rule violations: failing to properly name and designate the trust account, withdrawing funds payable to cash, failing to communicate the terms of his contingency fee agreement in writing, failing to respond to lawful demands of Bar Counsel, and giving false testimony before the Inquiry Panel. The appropriate sanction is disbarment.

The dissent asserts that Respondent's conduct does not amount to "a willful misappropriation of client funds or even willful defiance of Bar Counsel's requests." Dissenting op. at

231, 768 A.2d at 619. Judge Friedman found willful misappropriation. Is the dissent concluding, *sub silentio,* that Judge Friedman's finding is clearly erroneous? The dissent ignores Judge Friedman's finding that Respondent *intentionally* delayed paying the clients creditors in order to use funds belonging to one client to pay another client's obligations. These actions unquestionably amount to the unauthorized use by an attorney of client funds that were entrusted to him. It makes no difference whether Respondent received a personal benefit from the use of the funds, whether he intended to restore the money, or whether he was under stress when he took money from one client to pay another client's obligations. He willfully misappropriated client funds.

The dissent concludes that the sanction of disbarment in this case is "merely punitive." Dissenting op. at 232, 768 A.2d at 620. This is not so. We reiterate that the purpose of sanctions includes the preservation of public confidence in the legal profession and to make clear to the bar that such conduct will not be tolerated. Let the message be loud and clear: This Court will not tolerate invasion of client funds, misappropriation of client funds, or stonewalling requests of Bar Counsel for information about trust accounts.

The Court of Appeals for the District of Columbia, in discussing the impact on the public when an attorney steals client money, cogently noted that the court's treatment of such offenses affects public confidence much more than the offense itself. *See In re Addams,* 579 A.2d 190, 194 (D.C.1990). "Arguments for lenient discipline overlook this effect as well as the overriding importance of maintaining that confidence." *Id.* (quoting *In re Wilson,* 81 N.J. 451, 409 A.2d 1153, 1154 (1979)). Accordingly, Respondent's name shall be stricken from the rolls of those authorized to practice law in this State.

*IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–715(C), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE*

*ATTORNEY GRIEVANCE COMMISSION OF MARYLAND*
*AGAINST JACK A. BERNSTEIN.*

Dissenting opinion by WILNER, J., in which BELL, C.J., and ELDRIDGE, J. join in.

WILNER, Judge, dissenting.

I concur in the overruling of respondent's exceptions to Judge Friedman's conclusion that respondent violated Rule 8.4. With respect, I do most strenuously dissent, however, from the sanction of disbarment imposed by the Court. I agree that respondent's conduct was not only inappropriate but seriously so. He co-mingled funds and did not keep proper records and, as a result, allowed four overdrafts to occur in what should have been a trust account for client funds. He was also less than candid and forthcoming in response to Bar Counsel's legitimate requests for information and documentation.

All of that conduct was both wrong and inexcusable. I do not believe, however, that it amounted to the kind of willful misappropriation of client funds or willful defiance of Bar Counsel's request that was apparent in the cases cited and relied upon by the Court—*Attorney Griev. Comm'n v. White,* 328 Md. 412, 614 A.2d 955 (1992); *Attorney Griev. Comm'n v. Ezrin,* 312 Md. 603, 541 A.2d 966 (1988); *Bar Ass'n v. Marshall,* 269 Md. 510, 307 A.2d 677 (1973); and *Attorney Griev. Comm'n v. Owrutsky,* 322 Md. 334, 587 A.2d 511 (1991).

The co-mingling of client and attorney funds always creates the potential for misappropriation, even when there is no intent to misappropriate. A misappropriation necessarily occurs whenever the attorney withdraws funds from a co-mingled account for his or her own purpose and, as a result, leaves the account insufficient to cover all client funds, and such a misappropriation is never innocent. It is not necessarily willful, however, or for the conscious purpose of unlawfully taking funds held in trust for another.

In those situations where the misappropriation *is* willful and *is* consciously done for an unlawful purpose, disbarment is

almost always the appropriate response, for the attorney is then, in effect, stealing the client's money. That is essentially what occurred in the cases cited by the Court. That is not what happened here, however. Disbarment in this setting is not warranted, but is merely punitive, which is not its purpose. Under all of the circumstances apparent here, I believe that an indefinite suspension would be satisfactory.

Chief Judge Bell and Judge Eldridge have authorized me to state that they join in the views expressed in this dissenting opinion.