## ATTORNEY GRIEVANCE COMMISSION OF MARYLAND *v.* HERBERT LEONARD POLLACK

[Misc. Docket (Subtitle BV) No. 4,
September Term, 1976.]

*Decided January 24, 1977.*

The cause was submitted to MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and ORTH, JJ.

## ORDER

This Court having considered the recommendation of the Supreme Bench of Baltimore City and the record filed in the above entitled matter and no exceptions having been filed to the recommendation, it is this ___24th___ day of January, 1977

ORDERED, by the Court of Appeals of Maryland, that the recommendation be adopted and ɪhat Herbert Leonard Pollack be, and he is hereby, suspended from the further practice of law in the State of Maryland for a period of six months, beginning February 22, 1977; and it is further

ORDERED that the clerk of this Court shall strike the name of Herbert Leonard Pollack from the register of attorneys in this Court and certify that fact to the Trustees

of the Clients' Security Trust Fund and the clerks of all judicial tribunals in the State in accordance with Rule BV13.

| |
|---|
| /s/ Robert C. Murphy |
| /s/ Frederick J. Singley, Jr. |
| /s/ Marvin H. Smith |
| /s/ J. Dudley Digges |
| /s/ Irving A. Levine |
| /s/ John C. Eldridge |
| /s/ Charles E. Orth, Jr. |

Filed: January 24, 1977

/s/ James H. Norris, Jr.
_____
Clerk
Court of Appeals of Maryland

## MEMORANDUM OPINION OF THE PANEL

WATTS, KARWACKI, and SULLIVAN, JJ.

On June 21, 1976, The Bar Counsel of Baltimore City (The Bar Association) filed in this Court a petition instituting disciplinary proceedings against Herbert L. Pollack, a member of the Maryland Bar since 1958. On July 6, 1976, The Court of Appeals of Maryland entered an Order pursuant to 'Maryland Rule BV 9, *et seq.* referring the matter for hearing and determination to a three-judge panel of the Eighth Judicial Circuit.

The Attorney Grievance Commission of Maryland has charged that Herbert L. Pollack, a member of the Maryland Bar since 1958, did violate DR 6-101 (A) (3) and DR 7-101 (A) (2), Code of Professional Responsibility, Rule 1230, Appendix F, Maryland Rules of Procedure, through his neglect of legal matters entrusted to his professional care. There are three allegations of professional misconduct.

(i)

Failure to secure a divorce and child support for Mrs.

Evelyn E. Hicks after receiving a retainer fee of Three Hundred Fifty Dollars ($350.00) in advance.

### (ii)

Failure to secure a divorce for Mr. Fred Matheson after receiving a retainer fee of Five Hundred Dollars ($500.00).

### (iii)

Failure to represent Mrs. Bonnie L. Rouiller as administratrix of her late husband's estate. Pollack failed to transfer stock certificates, change an automobile title, and to process a small insurance policy.

A hearing on these charges was held on September 24, 1976 and October 1, 1976. The finding of facts of the three judge panel follows:

### *HICKS*

(Mrs. Evelyn Hicks died in the fall of 1975. Counsel stipulated to the following facts:)

In September, 1973, Pollack was retained by Mrs. Evelyn Hicks (Hicks) to handle a domestic case for her. He was paid three hundred fifty dollars ($350.00) in advance, and was also to be paid for any cost incurred. On October 23, 1973, he filed on her behalf a Bill of Complaint and a Show Cause Order for permanent alimony. He also appeared at two hearings, outside of the equity courts, with regard to support and arrearages owed Mrs. Hicks by her husband. (T., p. 63).

A complaint was filed by Hicks with the Bar Association in June, 1974. This complaint formed part of the subject matter of the hearing of February 12, 1975. Subsequent to this hearing her case was transferred, with her permission to Mr. Crawford by Mr. Pollack. Before her death in the fall of 1975 Pollack returned one hundred seventy-five dollars ($175.00) to her. (T., p. 100). At the time of the panel hearing in October, 1975, she advised the Bar Association that she no longer wanted to pursue the matter. (T., p. 63).

## MATHESON

In January of 1974, Mr. Fred Matheson (Matheson) consulted Pollack for the purpose of obtaining a divorce from his wife, Willie Matheson. (T., p. 108). During their preliminary negotiations, Matheson explained to Pollack that his wife had a long history of alcoholism, had been institutionalized several times, and that her last known address was Spring Grove State Hospital. The couple had been separated for approximately eight (8) years. (T., pp. 30-32). The contract entered into between Matheson and Pollack provided for a five hundred dollar ($500.00) fee to be paid in advance; one hundred fifty dollars ($150.00) was paid after the initial meeting, and in March, 1974, Matheson gave Pollack a check for the balance of three hundred fifty dollars ($350.00). (T., p. 33).

About two or three months after the initial contact with Pollack, Matheson experienced difficulty in contacting him at either his office or his home for a period of several months. (T., p. 7). Matheson subsequently wrote to the Bar Association of Baltimore City (Bar Association) and requested their assistance in ascertaining what action, if any had been taken on his behalf. (P. X 1). In response to his letter, Matheson received a telephone call from the Bar Association and a letter which confirmed the telephone conversation. (T., p. 8). Counsel for the Bar Association advised Matheson to telegram Pollack, which he did, but the telegram could not be delivered. (T., p. 10). Matheson subsequently had several phone conversations with an attorney for the Bar Association and received notice of a preliminary hearing to be held on the subject matter of his complaint. (T., p. 12).

A hearing was set for February 12, 1975, which Matheson did not attend. (T., p. 13). Subsequent to that hearing Matheson was directed by the Bar Association to contact Mr. James E. Crawford, Esq. (Crawford) and was told that he was to handle the divorce proceeding for Mr. Pollack. (T., p. 15). Matheson spoke with Crawford who thereupon contacted Mr. Pollack. Pollack telephoned Matheson about

two weeks later. (T., p. 12). Pollack indicated to Matheson that a hearing would be held on his divorce on or before April 15, 1975. (T., pp. 19-20).

Matheson had not heard from Pollack by April 15, 1975, and wrote a second letter to the Bar Association. (P. X 2). Subsequent to this letter he was notified that there would be a hearing on his complaint. (T., p. 21). Mr. Pollack contacted Matheson and asked him if he knew that a hearing had been scheduled. He excused the delay through illness, domestic strife, and difficulties in serving Mrs. Matheson. (T., p. 22). A hearing scheduled by the Bar Association on October 15, 1975, was continued at Matheson's request because he was satisfied with Pollack's explanations. (T., p. 23). However the hearing was subsequently scheduled on October 28, 1975, which was postponed because Matheson's witness could not appear. A second hearing was set for February 6, 1976, from which the divorce decree issued. On March 5, 1976, the Matheson divorce became final. (T., p. 28).

At his appearance before the three judge panel on September 24, 1976, Pollack described a long history of marital difficulties as mitigation. An already poor marital situation grew progressively worse from 1972 - 1974. The summer of 1974 was a period of rapid deterioration. As a result of a violent argument in July of 1974, the couple separated. In December of 1974, Mrs. Pollack took an overdose of sleeping pills and called Mr. Pollack. That evening Mr. Pollack drove to Atlantic City and brought her back to Baltimore. Both he and Mrs. Pollack's daughter convinced her to consult a psychiatrist because of her depressed state of mind. At this hearing, the following exchange took place. (T., p. 96).

> "THE CHAIRMAN: That is your mental state and condition and relationship with your wife was to the extent that you couldn't function completely and that is the reason for all three? (three separate complaints)
>
> MR. POLLACK: I would say that was a contributing factor. If you are talking in regards to

the Matheson case, we had trouble getting service. I had trouble resolving to myself that I could go on publication with a history like Willie Matheson, that is Fred Matheson's wife, having been in and out of institutions for alcoholism, I was hesitant. I had contacted, yes, I guess it did affect me because it was after one of the hearings, I think, after that I sent registered letters to, registered and regular mail, to three different addresses hoping that some place she would get a letter and it did work out that way because the supervisor from Spring Grove forwarded it to her and she contacted me and I told her she has to get an attorney to file an answer. She wrote a direct letter to the court and the matter was heard before Master Kenney, and resolved." (T., p. 97).

Later, during his testimony at the hearing, Pollack was asked: (T., p. 106).

MR. HOWARD: With regard to the Matheson matter, when did you send the three letters, one of which ultimately reached her through the director of Spring Grove?

POLLACK: October 25, 1975.

JUDGE KARWACKI: That was the first of the letters?

POLLACK: That was when I sent the letters to Spring Grove. It was after that that I had knowledge she was at Spring Grove. That was after the panel hearing, if that is what you are referring to.

JUDGE KARWACKI: My original question is what did you do between the summer of 1975 and the panel hearing?

POLLACK: The summer of 1975 and the panel hearing, I tried to contact, I made phone calls, to her brother, I had tried to call the hospital, the hospital wouldn't give you any information and it was after that I finally sent these letters out.

It is apparent that Pollack did little in furtherance of his client's interests between the summer of 1975, and the Bar Association's hearing on October 15, 1975. Moreover, the Bar Association had contacted James E. Crawford, Esq., and arranged for him to handle the matter for Pollack. Mr. Pollack failed to act before the hearing was held before the Grievance Committee. As a result, Mr. Matheson's divorce was delayed for a period of two years.

## ROUILLER

In December of 1972, Mrs. Bonnie Rouiller (Rouiller) retained Pollack for the purpose of settling the estate of her husband, Richard E. Rouiller, who had died in November of 1972. (T., pp. 39-40). Prior to that time the estate was opened, bond was obtained, notice to creditors was published, and Mrs. Rouiller was appointed the administratrix of the estate. (P. X 4). Rouiller explained to Pollack that the matter involved changing the name of several stock certificates from her husband's to her own and her daughter's names, transferring a car title to her, and settling a small insurance policy. (T., p. 40).

Between December, 1972, and February, 1974, Rouiller had several phone conversations with Pollack on these matters. In March of 1974 Rouiller informed Pollack that her oldest daughter would be marrying and asked him if that would involve another name change on the stock certificates. (T., p. 40).

Rouiller believed that, at the time of her husband's death, his car was titled in the name of his company, W. K. Ports & Co. (T., pp. 53-54). Because she did not hear from Pollack on this matter, Rouiller obtained a copy of the registration from the Department of Motor Vehicles (T., p. 48); this title was in her husband's and her own name. (T., p. 54). When she sold the car, sometime in 1974, she presented this duplicate and a copy of her husband's death certificate to the purchaser. (T., p. 48).

In October, 1974 Pollack visited Rouiller at her place of employment and asked her to sign several papers. He

indicated that they concerned the estate, but she did not understand their legal significance. Pollack told Rouiller that the whole matter would be settled within two weeks. Pollack also visited Rouiller at her home on October 28th. He brought her some papers to sign and told her that the estate was about to be closed. (T., p. 58).

Because she had not heard from Pollack, Rouiller filed a grievance with the Bar Association in May of 1975. (P. X 3). On September 3, 1975, she met with Crawford who was acting as Pollack's attorney at the request of the Bar Association. (T., p. 43). He told her that he had been unable to contact Pollack by phone and that he had sent a registered letter to him.

Rouiller was unable to determine what legal action had been taken on her behalf and decided to consult another attorney, Claude L. Callegary (Callegary). Callegary made several inquiries and informed Rouiller that the estate had been closed since October, 1974. In September of 1975, Pollack turned the stock certificates over to Callegary who has held them since that time. (T., p. 44).

During his appearance before the three judge panel, Pollack was asked to explain his handling of this matter. Mr. Pollack had no explanation for his inaction except his state of mind. (T., p. 94):

> "POLLACK: For me, to, well, I can't offer an excuse for my being dilatory. I can say that my favorite expression, hindsight, I can look back and give reasons why I acted a certain way and the reasons I acted that way is because my mind, I was going through a traumatic period and my mind was not functioning properly. Or, I wasn't in a mental state where I, where I would carry through or complete something that I had started. This didn't happen everyday and this didn't happen every matter, but, this situation with Mrs. Rouiller and the stocks, the court has before it the file from West Baltimore County that will reflect there were three cases that I ordered letters, twelve copies of

letters of administration which had to accompany the stock certificates for transfer. I, forms filled out which were turned over to Mr. Callegary. I went to a point, and I don't know why, I can't offer an explanation."

Later, during the same hearing, the following exchange took place: (T., p. 114).

JUDGE SULLIVAN: There was some testimony about Mrs. Rouiller, . . . , there was a car title and insurance policy left with her in addition to the stock certificates?

POLLACK: Yes.

JUDGE SULLIVAN: Do you know where the title to that automobile is?

POLLACK: I have the title to that automobile. Now, the, I have to clarify that. I have a title to that automobile in the W. Port Company, and I have, no, nothing to indicate that the title is, that, it is a little confusing. I don't think the title to that automobile was in W. Port Company as it was given to me and I believe was testified that before, correct me if I am wrong, before his death, Mr. Rouiller, and W. Port Company had put that car in their names. (T., p. 115).

JUDGE WATTS: Well, two parties?

POLLACK: And not Mr. and Mrs. Rouiller which is not the title was given to me.

JUDGE KARWACKI: In other words, you think you had an old obsolete title?

POLLACK: Yes.

JUDGE SULLIVAN: How about the insurance policy?

POLLACK: The letter and the policy was written and sent to the insurance company. And the letter stipulated, stated in there that the proceeds would be sent directly to Mrs. Rouiller and the reason was

that there was no banking account opened up or on the estate and sent directly to her. . . . .

JUDGE SULLIVAN: Was the receipt of the policy acknowledged and the death claim acknowledged?

POLLACK: I don't have any knowledge.

JUDGE SULLIVAN: Do you know it?

POLLACK: No, but I sent —

JUDGE SULLIVAN: In the form of an acknowledgement? You sent the insurance and the form claim that his policy — (T., p. 116).

POLLACK: Yes, there was testimony in it.

MR. CRAWFORD: Your honor, we will offer this as Respondent's Exhibit No. 1. (R X 1).

## PROFESSIONAL MISCONDUCT

On September 24, 1976, Pollack testified before the three judge panel that prior to the first letter of complaint sent to the Bar Association on these cases, no charges had ever been placed against him. The following exchange took place: (T., p. 84).

POLLACK: No, no charges were ever placed against me. There was one time I received a phone call from a Mr. Baker who was on the Grievance Committee of Baltimore City, it was a frivolous thing, resolved.

MR. CRAWFORD: How long ago was that?

POLLACK: It would have been back in 1960's.

POLLACK: I don't remember the exact (date).

Later at the same hearing, on cross examination: (T., p. 116).

MR. HOWARD: Mr. Pollack, you indicated that a complaint or some allegation against your professional conduct was lodged in the mid 60's? Would that complaint have been filed sometime, or

be as a result of representation of a client prior to June of 1966?

POLLACK: I don't recall.

MR. HOWARD: Would you recall if the name of the client involved or the complainant was Louis Maloff? (T., p. 117).

POLLACK: I recognize the name, Louis Maloff.

MR. HOWARD: Did you represent Louis Maloff?

POLLACK: I represented him, yes. I said I recognized the name.

MR. HOWARD: And you indicate to this panel that the matter was closed with no official action?

POLLACK: That is my recollection of it.

MR. HOWARD: If I advised you you were reprimanded by the Executive Committee of the Bar Association of Baltimore City — (T., p. 117).

POLLACK: I recognize the name, but I do not remember or recall the outcome of it. . . . I thought the complaint had been dismissed.

(The hearing was continued in order to allow the counsel for the Bar Association to obtain the minutes of the Executive Committee of the Bar Association of June 1966.)

When the hearing resumed on October 1, 1976, counsel entered into a stipulation of facts based on the official minutes of the Executive Committee of the Maryland State Bar Association of June 1966. A reprimand was issued by the Executive Committee in June of 1966, for the reason that Pollack had been dilatory with regard to a real estate transaction; specifically, with regard to filing the documents related to that transaction. (#2T., p. 2).

During his explanation of the circumstances surrounding that transaction, the following exchange took place: (#2T., pp. 3-5).

POLLACK: This situation took place about eleven years ago and until . . . things were brought to my attention I didn't have too much memory or

recall on it. However, Mr. Maloff had a Texaco Gas Station at one time on what would be the east side of Reisterstown Road. . .

Now I had frequented Mr. Maloff's Texaco Station as well as his motor repair place. I had done work in representations for him. He did work on my car and I, as a practice, paid cash for work on the car. The work wasn't satisfactory.

I then represented him in a real estate matter. Now, I don't recall whether it was a ground rent redemption or purchase. There is a difference as far as monetary matters are involved. If it had been a purchase, a mortgage would have been involved, papers would have been — I would have been rushed to put them on to protect the lending institution or the mortgagee. In this particular case I held the papers and did not put them on record. I was angry, disturbed, mad, trying to get my money back for work that Maloff did on my car that I felt he hadn't done properly. The next thing that I recall with the aid of these papers is that I put the papers on record. Maloff had gone to see another attorney and I didn't know who the attorney was or when the attorney contacted me. But I recorded the papers after being contacted and that's it.

MR. CRAWFORD: And you had testified prior that you did not recall a formal reprimand for these circumstances. Do you now recall the reprimand?

POLLACK: I have been shown a letter and I recall — or I received the letter at the time I was working for the City and according to the address it was delivered to me in the right of way division of the City office.

## CONCLUSIONS OF LAW

Maryland Rule 1230 (added October 13, 1970), which adopted the Code of Professional Responsibility of the American Bar Association as set forth in Appendix F of the

Maryland Rules, deals with, in Canon 6, a lawyer's competent representation of a client as follows:

## DISCIPLINARY RULES

DR 6-101 Failing to act competently

    (A) A lawyer shall not:

        (1) Handle a legal matter which he knows or should know that he is not competent to handle, without associating with him a lawyer who is competent to handle it.

        (2) Handle a legal matter without preparation adequate in the circumstances.

        (3) Neglect a legal matter entrusted to him.

It is the well-settled law of this State that the purpose of a disciplinary action is not to punish the offending attorney, but "is to protect the public from one who has demonstrated his unworthiness to continue the practice of law." The purpose of such proceeding has been characterized: "as a catharsis for the profession and a prophylactic for the public." See *Maryland State Bar Association v. Agnew*, 271 Md. 543-549 (1974). When it has been demonstrated that a lawyer was inattentive to his client's interest or lacks competence in dealing with legal matters, he has violated the Canons and should be disciplined. The Bar Association and the Supreme Bench must be vigilant in protecting the public against individuals who represent themselves to be competent and skillful and who neglect matters entrusted to them. As Judge O'Donnell stated in *Maryland State Bar Association v. Phoebus*, 276 Md. 353, 361 (1975):

"Because of the vital role an attorney, licensed to practice plays in the legal process, he must act with competence and proper care in representing his clients. His admission to the Bar attests to the public that he has met the standards for admission

and is competent to discharge his duties toward his clients with strictest fidelity. Once retained he must carefully safeguard the interest of his clients, must be diligent in his representation of the client's interest, must give appropriate attention to his legal work, and must observe the utmost good faith in his professional relationship. See Canon 6, EC 6-1 et seq. His right to continue to practice may be brought into question in a disciplinary proceeding, based upon conduct showing him to be unfit to continue to exercise the duties and responsibilities of an attorney."

The panel is aware that attorneys must deal with many disgruntled and difficult clients. However, in this case the complaints were justified and were not the result of anger, revenge, or recrimination. The witnesses against Mr. Pollack were understanding and forgiving.

The testimony has clearly demonstrated to this panel that Mr. Pollack acted incompetently, carelessly and negligently with respect to all three matters entrusted to him. At one point, he was candid with the panel and testified that "I have no excuse for being dilatory." This judicial admission of guilt strengthens the case against him.

The severity of the sanction to be imposed is dependent on the facts and circumstances of each case. The Court may consider facts of mitigation as well as an attorney's prior misconduct and any previous disciplinary sanctions which may have been imposed. See *Maryland State Bar Association v. Phoebus* (supra), and *Bar Association of Baltimore City v. Dearing*, 274 Md. 66 (1975) where neglect was found to be grounds for a two year suspension.

In the Pollack situation, if it were only one instance of negligence a reprimand might be sufficient. However, we have three separate cases of neglect and incompetence.

The cases supporting suspension in similar circumstances are numerous. In *Spindell v. State Bar*, 530 P. 2d 168 (1975), the California Court held that the delay of an attorney in obtaining a dissolution of a divorce for his client's marriage

as well as a failure to communicate with her, despite her persistent efforts to speak with him, justified a finding of willful dereliction in the discharge of professional duties, even though there was no deliberate intent to ignore client's needs. In *In re Albert*, 212 N.W.2d 17 (1973) the Michigan Court held that an attorney's inattention to the duties of his client, even if unaccompanied by moral delinquency, may call for censure and suspension.

There is no indication of deceit, fraud or dishonesty on the part of Mr. Pollack. The panel is also aware that Mr. Pollack did not profit or unjustly enrich himself by his acts. However, Courts have also generally held that returning all or part of fees does not excuse attorney's breach of professional conduct. See *Ferris v. Oneida County Bar Association*, 297 N.Y.S.2d 280 (1969).

The panel is aware that mitigating circumstances may be considered in determining the punishment to be imposed. *Marsh v. State Bar*, 2 Cal. 2d 75 (1934).

Respondent urges that the Court not impose sanctions and cites Respondent's mental and emotional state as its reasons therefore. He produced several members of the Bar who testified in support of his depressed and unstable mental condition which was caused by the break-up of his marriage. He claimed he was experiencing a period of stress and trauma and was unable to complete work he began. It was also agreed by all parties that he was very contrite about his neglect of his client's matters. The panel did find that he was going through a very stressful domestic period and gave that fact some weight in mitigation. However, the panel believes this situation does not excuse his dilatoriness because he was not completely disabled by his emotional turmoil. These matters did not require hours of concentrated work; it would have required very little effort to complete them. Therefore, there was no excuse for the prolonged failure to attend to clients' business.

Finally, in its determination of the disciplinary sanction the panel was concerned by Respondent's lack of candor in testimony about prior involvement with the Bar Association. Initially he testified that he had a minor

problem which was resolved on the telephone with an attorney representing the Association. It was only after the minutes of the Executive Committee of the Maryland State Bar Association were produced, indicating that in June, 1966, he was reprimanded by the Grievance Committee that his recollection became more clear. In that matter he admitted that he delayed in recording a Ground Rent Deed in order to obtain money which he felt the client owed him as a result of unsatisfactory work done by the client on his car. In other words, he allowed his personal business to interfere with his law business and failed to act with diligence.

The Respondent's lack of candor with the Court, and the failure of that reprimand to impress upon him the seriousness of his duties as an attorney were considered by the panel.

## RECOMMENDATION

The three judge panel unanimously agree that negligent and unprofessional conduct merits disciplinary action. It is also the unanimous opinion of the panel that the petitioner should not be disbarred. After giving serious consideration to all of the factors of mitigation and extenuating circumstances the panel unanimously recommends that Herbert Leonard Pollack be suspended from the practice of law for Six (6) months.

/s/Robert B. Watts

/s/ Robert L. Karwacki

/s/ Robert L. Sullivan, Jr.

Dated: November 30, 1976