778 A.2d 390

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND**

v.

**Michael A. JETER.**

**Misc. Docket (Subtitle AG), No. 37, Sept. Term, 1999.**

Court of Appeals of Maryland.

Aug. 17, 2001.

Melvin Hirshman, Bar Counsel and James P. Botluk, Asst. Bar Counsel, for Atty. Grievance Com'n of Md.

J. Wyndal Gordon, Baltimore, for Respondent.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

BELL, Chief Judge.

The Attorney Grievance Commission of Maryland (the "Commission"), the petitioner, by Bar Counsel, acting pursuant to Maryland Rule 16–709, filed a Petition for Disciplinary Action against Michael A. Jeter, the respondent, alleging that he engaged in misconduct by violating certain of the Maryland Lawyers' Rules of Professional Conduct. The charges arose out of the respondent's representation of Benita Brown in connection with her personal injury claim arising out of an automobile accident and involved, *inter alia*, the fee the respondent charged, the respondent's failure to maintain a trust account and the respondent's failure to promptly disburse payment to the physical therapist who treated Ms. Brown. The Honorable Thomas Bollinger of the Circuit Court for Baltimore County, to whom the case was referred, pursuant to Maryland Rule 16–711(a),[1] for hearing and to make findings of fact and draw conclusions of law, determined that the respondent violated Maryland Rules of Professional Conduct 1.5 (Fees)[2] and 1.15 (Safekeeping Property),[3] Mary-

---

1. Rule 16–711(a) reads:

 "Rule 16–711. Disposition of Charges.
 a. Findings. A written statement of the findings of fact and conclusions of law shall be filed in the record of the proceedings and copies sent to all parties."

2. Maryland Rule 1.5(c) permits a contingent fee, but requires that its terms "be communicated to the client in writing," stating "the method by which the fee is to be determined, including the percent or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal, litigation and other expenses to be deducted from the recovery, and whether such expenses are to be deducted before or after the contingent fee is calculated."

3. That Rule provides:

 "(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules. Other property shall be identified as such and appropri-

land Rules 16–603 (Duty to Maintain Account)[4] and 16–604 (Trust Account–Related Deposits)[5] and Maryland Code (1989, 1995 Repl.Vol.), § 10–306 of the Business Occupations and Professions Article,[6] but not Maryland Rule of Professional Conduct 8.1 (Bar Admission and Disciplinary Matters).[7]

---

ately safeguarded. Complete records of such account funds and of other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

"(b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

"(c) When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved."

4. "An attorney or the attorney's law firm shall maintain one or more attorney trust accounts for the deposit of funds received from any source for the intended benefit of clients or third persons. The account or accounts shall be maintained in this State, in the District of Columbia, or in a state contiguous to this State, and shall be with an approved financial institution. Unless an attorney maintains such an account, or is a member of or employed by a law firm that maintains such an account, an attorney may not receive and accept funds as an attorney from any source intended in whole or in part for the benefit of a client or third person."

5. "Except as otherwise permitted by rule or other law, all funds, including cash, received and accepted by an attorney or law firm in this State from a client or third person to be delivered in whole or in part to a client or third person, unless received as payment of fees owed the attorney by the client or in reimbursement for expenses properly advanced on behalf of the client, shall be deposited in an attorney trust account in an approved financial institution. This Rule does not apply to an instrument received by an attorney or law firm that is made payable solely to a client or third person and is transmitted directly to the client or third person."

6. "A lawyer may not use trust money for any purpose other than the purpose for which the trust money is entrusted to the lawyer."

7. "An applicant for admission or reinstatement to the bar, or a lawyer in connection with a bar admission application or in connection with a

The basis for these conclusions was set forth in the Court's Memorandum Opinion and Order, as follows:

"The basis for this Petition for Disciplinary Action is that the Respondent, while a member of the Bar of this Court, undertook the representation of Benita L. Brown in connection with her personal injury claim arising from an automobile accident on October 11, 1997. Ms. Brown was treated by Bonnie Schulman, a physical therapist, in October of 1997 for injuries sustained in the automobile accident. Ms. Brown signed an authorization on October 17, 1997 which authorized Ms. Schulman to make a claim for payment from the insurance company and requesting that the company pay Ms. Schulman.

"Ms. Schulman filed a claim with Ms. Brown's insurance [company], Allstate Insurance Company. In December of 1997 the Respondent received a check from Allstate representing personal injury protection benefits compensating Ms. Brown for the treatment rendered by Ms. Schulman. The check was endorsed and placed in an account that the Respondent had with the Provident Bank of Maryland. This account was not an escrow account. Respondent [did] not forward payment to Ms. Schulman until June 10, 1998, six months after depositing the check. Payment was made by cashier's check.

"In addition, Respondent received a $3,000 check in settlement of Mr. Brown's claim in April of 1998, and deposited same in his operating account. Respondent did not communicate the terms of his representation with Ms. Brown in writing. It is further alleged that the Office of Bar Counsel sent three letters to the Respondent requesting a response

---

disciplinary matter, shall not:

"(a) knowingly make a false statement of material fact; or

"(b) fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter, or knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority, except that this Rule does not require disclosure of information otherwise protected by Rule 1.6."

to the Complaint beginning June 17, 1998 and through July 28, 1998, and Respondent failed to submit a written answer.

\* \* \* \*

## "TESTIMONY

Mr. Benis, investigator for the Attorney Grievance Commission, testified for purposes of the admission of various documents concerning his investigation and his interviews with the Respondent. His investigation revealed that there was no evidence that the Respondent was in any way enriched by his actions in this matter.

"Mr. Tim Turner testified that he is a friend of Benita Brown, the claimant in this case, and that they have a child together. He has known the Respondent since they were children, has been a personal friend, and he referred Ms. Brown to the Respondent for legal representation. He was under the impression that Mr. Jeter was taking the case for free doing [him] and Ms. Brown a favor. He handled all matters between Ms. Brown and the Respondent, and he authorized Mr. Jeter to keep the $391 for his expenses out of the proceeds of the personal injury checks.

"Benita Brown testified that she retained Mr. Jeter for representation as a result of an automobile accident. She went to a physical therapist and, other than that, allowed Mr. Jeter and her fiancé, Tim Turner, to handle everything. She gave her consent for Mr. Jeter to sign her name to the checks received from the personal injury protection carrier and from Allstate Insurance Company. She testified that she thought that Mr. Jeter took the case on a *pro bono* basis. She had no second thoughts about anything Mr. Jeter did, and she received all the funds that she believed were rightly due her.

"Michael Jeter, Esquire testified and basically agreed with the alleged facts of the petition. He was introduced to his client, Benita Brown, by his longtime friend, Tim Turner, and handled everything through Mr. Turner with Ms. Brown's consent. He agreed that at that time he did not

have an escrow account, and stated the one he did have was opened in 1997 but closed in 1998. Mr. Jeter further stated that he has now opened a new escrow account and agreed that he did not deposit any of the checks for Ms. Brown in any escrow or trust account. He further testified that he endorsed the personal injury protection checks and the final settlement check with the full knowledge and consent of Ms. Brown.

"In addition, the Respondent produced the following witnesses: Kelley Jackson testified that she knows Mr. Jeter well and that he represented her in her divorce proceeding two years ago. She stated that he handled matters very well and that she would go to him again for representation. Gregory Gaskins, Esquire, Assistant Solicitor for Baltimore County, has known Mr. Jeter and testified that he believes Mr. Jeter is fit to practice law and that he is honest."

The court also found, by the preponderance of the evidence, that the violations in this case were mitigated by the respondent's inexperience in handling personal injury cases, his practice being primarily a criminal practice, and by the fact that, having taken the case as a favor to a childhood friend, the respondent "was not enriched personally as a result of his various actions in this case." It was of significance to the court that, despite having taken a professional responsibility course, "the [r]espondent was not familiar with the requirements under the Rules of Professional Conduct and the Maryland Rules that called for a duty to maintain an escrow account for the handling of client funds." The court opined further in this regard:

"Perhaps the events in this case would not have taken this course had the Respondent thoroughly understood the professional responsibilities required for the handling of personal injury cases. This Court finds that the Respondent is truly remorseful. He never intended to defraud Ms. Schulman (the physical therapist) or Ms. Brown (his client). The Respondent naively considered that as long as they were paid in the long run, regardless of how he handled the funds, this was professionally responsible."

Both the petitioner and the respondent filed exceptions. The petitioner excepted to the court's findings of fact and conclusions of law, four in number. In the first, it challenges the court's failure to find that the respondent violated Rule 8.1. The petitioner notes that, other than one written response, requesting an extension of time to answer and stating that the physical therapist had been paid and attaching a copy of the cashier's check, the respondent failed to respond in writing to its three letters demanding response to the complaint. In addition, it relies on the fact that the respondent did not respond in writing even after being specifically directed to do so.

The other exceptions are to findings of fact made by the court: that the respondent did not intend to defraud either the client or the physical therapist; that the fact that the respondent was not personally enriched was a mitigating factor; and that the respondent's conduct was mitigated because he was not familiar with the requirements of the Rules of Professional Conduct. As to each such finding, the petitioner argues, in effect, that once the doing of the act underlying the rule violation is established, the intent with which it was done is irrelevant or, at least, it is not mitigating. What the petitioner says with respect to the finding of a lack of intent to defraud is illustrative:

"Respondent's use of Ms. Schulman's money, even assuming he intended that she would ultimately be paid, was done with fraudulent intent since he had promised to pay her from the final settlement proceeds and instead took the money himself."

The respondent's exceptions challenged the source of some of the evidence that formed the basis for the court's findings of fact. In particular, characterizing it as hearsay, he believes that the court erred in considering the Inquiry Panel transcript of the testimony of the physical therapist, who did not appear at the hearing of the complaint. Moreover, the respondent maintains that the evidence adduced by the petitioner to establish the respondent's violation of the rules he was found to have violated was insufficient for that purpose.

The parties' recommendation of sanctions is also different. The petitioner seeks disbarment, while the respondent believes that the complaint should be dismissed. The respondent's alternative position is that, should his exceptions be overruled, the appropriate sanction would be a reprimand.

To be sure, a respondent is required, by Rule 8.1(b), to respond to the request from Bar Counsel for information in connection with the investigation of a complaint. Indeed, just recently, in *Attorney Griev. Comm'n v. Oswinkle,* 364 Md. 182, 189, 772 A.2d 267, 271 (2001), this Court made clear that the failure to so respond is a sanctionable violation. *See also Attorney Griev. Comm'n v. Fezell,* 361 Md. 234, 255–56, 760 A.2d 1108, 1119 (2000). Just because the petitioner charges a violation of Rule 8.1, however, does not mean that the court must find the violation; the court still must determine whether the respondent in fact failed to respond as the Rule requires.

The petitioner's exception stresses that the respondent did not respond in writing to its request for a response to the complaint filed against him. In point of fact, however, the petitioner admits that it did respond in writing at least to a portion of the complaint, that portion related to the physical therapist. Moreover, the Rule does not, by its terms, indicate that a written response is mandated or even that there is a preference for such a response. The court found no violation of Rule 8.1. While it did not elaborate on the reason, we presume that trial judges know the law and correctly apply it. *See Roach v. State,* 358 Md. 418, 427, 749 A.2d 787, 792 (2000); *Elias v. State,* 339 Md. 169, 188, 661 A.2d 702, 711 (1995); *Gilliam v. State,* 331 Md. 651, 673, 629 A.2d 685, 696 (1993); *Medical Mutual v. Evans,* 330 Md. 1, 34, 622 A.2d 103, 119 (1993); *Smith v. State,* 306 Md. 1, 8, 506 A.2d 1165, 1168 (1986). Accordingly, we cannot say that the court's finding on this point was clearly erroneous. *See Attorney Griev. Comm'n of Maryland v. Awuah,* 346 Md. 420, 434, 697 A.2d 446, 453 (1997); *Attorney Griev. Comm'n v. Kemp,* 303 Md.

664, 674, 496 A.2d 672, 677 (1985). *See also* Md. Rule 8–131. The petitioner's exception is overruled.

 The court made findings concerning the respondent's intention, knowledge of the Rules of Professional Conduct and the effect of the misconduct on the respondent's financial well-being. While these matters will not determine whether the misconduct charged occurred, they are relevant to the question of the appropriate sanction. That the effect of the respondent's action may be to misappropriate funds belonging to another, as in *Attorney Griev. Comm'n v. Bernstein,* 363 Md. 208, 221, 768 A.2d 607, 614 (2001), does not mean that the actions were taken with the intent to misappropriate.

 Similarly, this is the case with respect to the finding of no personal enrichment and the respondent's knowledge of the Rules of Professional Conduct. Clearly, one who acts with deliberation and calculation, fully cognizant of the situation and, therefore, fully intending the result that is achieved is more culpable than one who, though doing the same act, does so unintentionally, negligently or without full appreciation of the consequences. Again, this exception by the petitioner is accordingly overruled.

The respondent's exceptions fare no better. There simply is no basis, on this record, for this Court to conclude that the court committed error in admitting the evidence to which the respondent excepts.

This brings us to the question of the appropriate sanction to be imposed. As indicated, the petitioner seeks disbarment and the respondent thinks that, at most, a reprimand is warranted.

 The purpose of disciplinary proceedings against an attorney is well settled and has been stated by this Court on many occasions: to protect the public rather than to punish the attorney who engages in misconduct. *Attorney Griev. Comm'n of Maryland v. Tolar,* 357 Md. 569, 584, 745 A.2d 1045, 1053 (2000); *Attorney Griev. Comm'n of Maryland v. Myers,* 333 Md. 440, 446–47, 635 A.2d 1315, 1318 (1994);

*Attorney Griev. Comm'n v. Goldsborough,* 330 Md. 342, 364, 624 A.2d 503, 513; *Attorney Griev. Comm'n v. Protokowicz,* 329 Md. 252, 262–63, 619 A.2d 100, 105 (1993); *Attorney Griev. Comm'n v. Hamby,* 322 Md. 606, 611, 589 A.2d 53, 56 (1991); *Attorney Griev. Comm'n v. Myers,* 302 Md. 571, 580, 490 A.2d 231, 236 (1985); *Attorney Griev. Comm'n v. Velasquez,* 301 Md. 450, 459, 483 A.2d 354, 359 (1984); *Attorney Griev. Comm'n v. Montgomery,* 296 Md. 113, 119, 460 A.2d 597, 600 (1983). That purpose is achieved "when sanctions are imposed that are commensurate with the nature and gravity of the violations and the intent with which they were committed." *Attorney Griev. Comm'n. v. Awuah,* 346 Md. 420, 435, 697 A.2d 446, 454 (1997). In other words, a sanction is imposed to demonstrate to members of the legal profession the type of conduct that will not be tolerated. *Attorney Griev. Comm'n v. Kerpelman,* 288 Md. 341, 382, 420 A.2d 940, 959 (1980), *cert. denied,* 450 U.S. 970, 101 S.Ct. 1492, 67 L.Ed.2d 621 (1981). Thus, the facts and circumstances of the case before the Court inform the sanction to be imposed, *Attorney Griev. Comm'n of Maryland v. Franz,* 355 Md. 752, 761, 736 A.2d 339, 344 (1999); *Attorney Griev. Comm'n v. Ober,* 350 Md. 616, 631–32, 714 A.2d 856, 864 (1998); *Hamby,* 322 Md. at 611, 589 A.2d at 56; *Attorney Griev. Comm'n v. Babbitt,* 300 Md. 637, 642, 479 A.2d 1372, 1375 (1984), that is, the nature and extent of the discipline imposed is dependent on the severity of the attorney's misconduct and the particular facts of the case. *Attorney Griev. Comm'n of Maryland v. Pennington,* 355 Md. 61, 78, 733 A.2d 1029, 1037–38 (1999); *Attorney Griev. Comm'n of Maryland v. Milliken,* 348 Md. 486, 519, 704 A.2d 1225, 1241 (1998); *Attorney Griev. Comm'n v. Montgomery,* 318 Md. 154, 165, 567 A.2d 112, 117 (1989).

 ■■■ We have also made clear that the attorney's prior grievance history, including whether there were prior disciplinary proceedings, the nature of the misconduct involved and the sanction imposed, as well as facts in mitigation, are to be taken into account. *Franz,* 355 Md. at 762–63, 736 A.2d at 344 (1999); *Maryland State Bar Ass'n v. Phoebus,* 276 Md. 353, 362, 347 A.2d 556, 561 (1975). Another factor to be considered

is the respondent's remorse for the misconduct, *Attorney Griev. Comm'n v. Wyatt*, 323 Md. 36, 38, 591 A.2d 467, 468 (1991); the Court " 'may consider facts in mitigation....' " *Attorney Griev. Comm'n v. Kenney*, 339 Md. 578, 587, 664 A.2d 854, 858 (1995) (quoting *Attorney Griev. Comm'n v. Pollack*, 279 Md. 225, 238, 369 A.2d 61, 68 (1977)). Moreover, an attorney's voluntary termination of the misconduct, accompanied by an appreciation of the serious impropriety of that past conduct and remorse for it, has been viewed as evidence that the attorney will not thereafter engage in such unethical conduct if permitted to continue practice. *Attorney Griev. Comm'n v. Freedman*, 285 Md. 298, 300, 402 A.2d 75, 76 (1979). Just as they are among the most relevant considerations in determining a sanction for failure to file income tax returns, the intention and motive of the respondent in engaging in the misconduct are also to be considered. *Attorney Griev. Comm'n v. Breschi*, 340 Md. 590, 601, 667 A.2d 659, 665 (1995).

In arguing for disbarment, the petitioner relies on *Attorney Griev. Comm'n v. Briscoe*, 357 Md. 554, 745 A.2d 1037 (2000), *Attorney Griev. Comm'n v. Milliken*, 348 Md. 486, 704 A.2d 1225 (1998), *Attorney Griev. Comm'n v. Boyd*, 333 Md. 298, 635 A.2d 382 (1994) and *Attorney Griev. Comm'n v. Sheridan*, 357 Md. 1, 741 A.2d 1143 (1999). *Briscoe*, it is submitted, is comparable to the case *sub judice*, since the respondent in that case was disbarred for committing many of the same acts with which the respondent has been charged and found to have committed: failing to have a written contingency agreement; failure to make appropriate disbursements from client settlements, failure to maintain a trust account and failure to produce records requested by an Inquiry Panel. In both *Milliken* and *Boyd* commingling of client funds in non escrow accounts contributed to the disbarments in those cases. To show how seriously this Court considers an attorney's failure to hold client funds in trust, the petitioner offers *Sheridan*, in which we opined:

"We cannot understate the importance of holding funds in escrow in accordance with Rule 1.15 and how the Rule

reinforces the public's confidence in our legal system. Escrow accounts serve as sanctuary for client funds from the attorney's creditors. . . . They also provide peace of mind and order to disputing parties, assuring that no one party will exercise control over funds until an independent resolution of the dispute."

357 Md. at 31, 741 A.2d at 1159.

The petitioner also relies on *Bernstein*, citing it for the dual propositions that a lawyer's intentional delay in paying one client's creditors in order to pay another client's obligations "amount[s] to the unauthorized use by an attorney of client funds that were entrusted to him," *Bernstein*, 363 Md. at 230, 768 A.2d at 619 and that ". . . every attorney is deemed to know the Rules of Professional Conduct and is charged with the knowledge of how to operate and maintain a trust account." *Id.* at 228, 768 A.2d at 618. *Awuah*, in which the respondent failed to honor assignments and authorizations and deposited client funds in an operating account, 346 Md. at 432, 697 A.2d at 452, is dismissed as involving negligence, as contrasted with this case, which the petitioner characterizes as intentional.

We are not persuaded. In none of the cases on which the petitioner relies did the court make findings comparable to those made by the court in the case *sub judice*. In neither *Bernstein* nor *Briscoe* did the court find that the attorney that was the subject of the disciplinary proceedings had no intention to defraud those who were affected by his misconduct. Neither did either of those courts conclude that the attorney was remorseful. Indeed, in *Bernstein*, the hearing court specifically found that the respondent in that case had willfully misappropriated client funds and specifically rejected that respondent's explanation for why the trust account fell below the trust obligation. 363 Md. at 227–228, 768 A.2d at 617–618. Moreover, while we did say in *Bernstein* that neither ignorance of ethical duties nor ignorance of bookkeeping requirements is a defense in disciplinary proceedings, we also stated quite clearly, that "a finding with respect to intent with which a violation was committed may have a bearing on the appro-

priate sanction." *Id.* at 228, 768 A.2d at 618, *citing Awuah,* 346 Md. at 435, 697 A.2d at 454. In addition, the violations found in *Bernstein* were more considerable than in this case, including the serious finding of a failure to cooperate with Bar Counsel; which was supported by evidence that the respondent failed to respond to lawful demands of Bar Counsel on at least seven separate occasions. 363 Md. at 226, 768 A.2d at 617.

*Milliken* and *Boyd* simply are inapposite. Indeed, the petitioner admits as much by conceding that in each of those cases, there was additional conduct not involved in this case.

What we said in *Sheridan* remains true and should not be undermined. Nevertheless, effect must also be given to factual findings of the court that affect the sanction to be imposed. We did not, by emphasizing, in that case, the importance of trust accounts, intend thereby to suggest that all mitigating factors or findings may be disregarded whenever violation of the trust account rules, or other provisions, is involved.

*Awuah* is not so easily dismissed as the petitioner would have it. The decisive finding, though expressed in terms of ineptitude or negligence, was that the respondent in that case did not act intentionally, either in failing to return monies to his clients or in failing to pay assignments or authorizations. In point of fact, in *Awuah,* "the overwhelming conceded evidence with respect to the Respondent's total ineptness concerning the handling of the business aspects of his practice," 346 Md. at 434, 697 A.2d at 453, was the basis for the court's conclusion that the respondent in that case did not intentionally violate the trust account rules and for finding that he did not violate Rule 8.4, proscribing conduct involving dishonesty, fraud, deceit and misrepresentation. The former is the case here, while the respondent was found to have violated the charged rules, for sanction purposes, the court determined that he did not do so intentionally. The respondent is entitled to the benefit of those findings.

Under the circumstances, given the court's findings that the respondent did not intend to defraud and that the respondent was remorseful, the appropriate sanction is an

indefinite suspension with a right to reapply for admission to the Bar in six months.

IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSU-ANT TO MARYLAND RULE 16–715, FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTOR-NEY GRIEVANCE COMMISSION AGAINST MICHAEL A. JETER.

Concurring and dissenting opinion by HARRELL, J., joined by RAKER and BATTAGLIA, JJ.

HARRELL, Judge, concurring and dissenting:

I agree with the Majority opinion regarding everything, including the sanction, save for the overruling of Petitioner's exception to the hearing judge declining to conclude that Respondent violated Rule 8.1(b). I would sustain Petitioner's exception on this point. Even though it does not change the sanction, in my view, this disagreement compels me to write separately because the reasoning of the Majority opinion in this regard is counter-indicated by our recent cases and the need for appropriate consistency in the application of Rule 8.1(b).

I perceive that the Majority (Maj. op. at 289) mischaracter-izes what this Court should be focused on in the hearing judge's Memorandum Opinion And Order of 7 March 2001 and, therefore, applies the wrong standard of review. It is beyond debate that the hearing judge made no true findings of fact on the matter of Rule 8.1(b).[1] Instead, after neutrally

---

1. Nonetheless, it appears undisputed on this record that Bar Counsel established, in writing, three separate written response deadlines (13 July, 28 July, and 5 August 1998) for Respondent by which to answer the complaint and that Respondent's only written response to any of these deadlines was to request a further extension and allege that Ms. Schulman, the therapist, ultimately had been paid (attaching a photo-copy of an impliedly corroborative cashier's check). Respondent al-leged in his Response To Petitioner's Exceptions (at 2) in this Court,

reciting some of the other evidence adduced by the parties, the hearing judge proceeded directly to "not find a violation of Rule 8.1" (Memorandum Opinion and Order, at 7). As the Majority gently puts it (Maj. op. at 288–89), the hearing judge "did not elaborate on the reason" for this conclusion. Despite the hearing judge's use of a negative form of the verb "to find" in announcing his ultimate recommendation regarding Rule 8.1(b), and the Majority being seduced by the use of that term, it is clear that what the hearing judge did in this case is offer us a conclusion of law, bereft of any supportive fact-finding or analysis. As such, the hearing judge's conclusion of law is not entitled to review under the clearly erroneous standard applied by the Majority (Maj. op. at 288–89). Rather, the hearing judge's conclusion of law is reviewed de novo by this Court. As Judge Battaglia recently summarized:

> As holder of original and complete jurisdiction over attorney disciplinary proceedings, the ultimate decision as to whether a lawyer has violated professional rules rests with this Court. Under an independent review of the record, this Court determines whether the findings of the hearing judge are based on clear and convincing evidence. The "hearing court's findings of fact are prima facie correct and will not be disturbed unless they are shown to be clearly erroneous." The conclusions of law are reviewed de novo.

*Attorney Griev. Comm'n v. Clark,* 363 Md. 169, 180–81, 767 A.2d 865, 871–72 (2001) (citations omitted).

Turning to the substantive analysis of the Rule 8.1(b) charge, I note that the Court, particularly of late, has made a point of sending a clear and consistent message, in a variety of factual circumstances, to the Bar of Maryland that an attorney's unjustified failure to respond or cooperate with the office of Bar Counsel in its investigations will not be overlooked. *See, e.g., Atty. Griev. Comm'n v. Oswinkle,* 364 Md. 182, 187, 772 A.2d 267 (2001) (failure to respond to repeated inquiries of Bar Counsel is a violation of 8.1(b)); *Atty. Griev. Comm'n v.*

---

assumedly for mitigation purposes, that Respondent ultimately was interviewed by Petitioner's investigator on 3 August 1998.

*Bernstein,* 363 Md. 208, 228, 768 A.2d 607, 618 (2001) ("failure to cooperate with Bar Counsel is a serious violation"); *Atty. Griev. Comm'n v. Fezell,* 361 Md. 234, 253, 760 A.2d 1108, 1118 (2000) ("belated cooperation with Bar Counsel does not excuse Respondent's failure to respond to the previous five letters sent by Bar Counsel"); *Atty. Griev. Comm'n v. Bridges,* 360 Md. 489, 512–14, 759 A.2d 233, 245–46 (2000) (holding refusal to provide requested documents sought by Bar Counsel by letter and later by subpoena, and to appear at an Inquiry Panel hearing, violated Rule 8.1(b)); *Atty. Griev. Comm'n v. Shaw,* 354 Md. 636, 644–46, 732 A.2d 876, 880–81 (1999) (violation of Rule 8.1 found when respondent failed to respond to two letters, two telephone calls, and a request for Admission of Facts); *Atty. Griev. Comm'n v. Hallmon,* 343 Md. 390, 407–08, 681 A.2d 510, 519 (1996) (refusal to be interviewed by Bar Counsel's investigator found to violate Rule 8.1(b)). As we summarized in *Fezell,* this Court has a long history of holding that an attorney violates 8.1(b) by failing to respond to letters from Bar Counsel requesting information. *See Fezell,* 361 Md. at 249–250, 760 A.2d at 1116–17 (listing this Court's prior consistent holdings that Bar Counsel's letters requesting information are lawful demands that compel a timely response).

Although we are not bound to conclude that a violation of Rule 8.1(b) has occurred merely because Bar Counsel levels such a charge, the record in the present case amply supports that such a violation occurred. Respondent's letter requesting an extension of time and alleging that Ms. Schulman ultimately was paid was, at best, only a partial response. *See Atty. Griev. Comm'n v. Webster,* 348 Md. 662, 674, 705 A.2d 1135, 1141 (1998) (dilatory and partial response to Bar Counsel's requests for bank records is a violation of 8.1(b)). As the Majority notes (Maj. op. at 282–85), much more potentially was at stake under the Rules of Conduct, as implicated by the complaint in this case, than whether Respondent eventually paid the therapist. A partial response, by parity of reasoning, should impart only a partial defense. For example, we concluded in *Webster* that an attorney violated 8.1(b) even though

he eventually provided some of the information requested by Bar Counsel. *Id.* Likewise, in the present case, the remaining matters for which no timely, written response was forthcoming support the charge of a violation of 8.1(b).

The Majority also seems to ground its reasoning on the premise that "the Rule does not, by its terms, indicate that a written response is mandated or even that there is a preference for such a response" (Maj. op. at 288). That is a weak justification for excusing Mr. Jeter's failure to make a full and substantive response. If Bar Counsel requests, directs, or demands a written response, as its first line of inquiry to an attorney regarding a complaint, we should not become involved in second-guessing whether that decision properly invokes the protection afforded an investigation under Rule 8.1(b). We, in the past, have shown no such inclination and sensibly have allowed Bar Counsel to specify the response required. *See, e.g., Fezell,* 361 Md. at 252–53, 760 A.2d at 1117–18 (letters from Bar Counsel qualify as lawful demands for purposes of rule 8.1(b)); *Hallmon,* 343 Md. at 407–08, 681 A.2d 510, 519–20 (holding that attorney violated Rule 8.1 when he refused to meet with an Assistant Bar Counsel to discuss an investigation after being requested to do so in a letter from the Assistant Bar Counsel); *Atty. Griev. Comm'n v. Kenney,* 339 Md. 578, 587, 664 A.2d 854, 858, (1995) (holding that attorney violated Rule 8.1 when he failed to provide records of his escrow accounts and other information after being requested to do so by Bar Counsel).

If the Court were inclined to engage in fact-finding, I note that Respondent, in his Response To Petitioner's Exceptions (at 2) filed with us, asserts that he submitted to an inperson, oral interview by Bar Counsel's investigator on 3 August 1998, which date fell within the last deadline given by Bar Counsel for him to respond, in writing, to Petitioner's lawful demands. Assuming this to be a fact, it bears, I think, on the sanction, not on whether violations occurred earlier. *See, e.g., Fezell,* 361 Md. at 253, 760 A.2d at 1118 (belated cooperation does not excuse a prior failure to respond); *Webster,* 348 Md. at 674, 705 A.2d at 1141 (eventual production of some of the request-

ed information is not a timely response to Bar Counsel's request). If we were to conclude further that the content of Respondent's interview by the investigator on 3 August was responsive fully to the complaint (a conclusion with which some doubt is associated as the investigator nonetheless reportedly informed Respondent at the end of the interview that Respondent still needed to respond to Bar Counsel's letters in writing), that would be, in my view, an appropriate basis for at least not increasing the sanction imposed by the Majority. That is why I do not argue for a greater sanction here, even though I conclude there was proven a violation of Rule 8.1(b).

The clear message that has been sent, and should continue to be sent, is that attorneys must make timely and complete responses to all lawful and reasonable demands made by Bar Counsel for information, not that they may avoid being found in violation of Rule 8.1(b) by dent of half-hearted or dilatory (or, worst, obfuscatory) efforts at partial obeisance to the requirements of the Rule.